**APACHE TRADING CORPORATION, Kevin Lynn, and Mike Safer, Petitioners,**

v.

**Harvey TOUB, and the Commodity Futures Trading Commission, Respondents.**

No. 86–5173.

United States Court of Appeals, Eleventh Circuit.

May 11, 1987.

Charles Franken, Franken & Stark, Plantation, Fla., for Apache Trading Corp.

Alan M. Medof, Atlanta, Ga., for Toub.

Joel R. Maillie, Office of Gen. Counsel, Commodity Futures Trading Com'n, Whitney Adams, Washington, D.C., for CFTC.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Apache Trading Corporation (Apache), Kevin Lynn and Mike Safer petition this court to review a reparation award in favor of Harvey Toub entered by an administrative law judge (ALJ) with the Commodity Futures Trading Commission. Apache, Lynn and Safer contend that the weight of the evidence does not support the ALJ's verdict and that the ALJ abused his discretion in his scheduling of the hearing. We find the petitioners' contentions unsupported by the record below or case law, and, consequently, we affirm Toub's reparation award.

## I. FACTS

In April 1983, Tony Chaskelson,[1] a representative of Apache, contacted Harvey Toub at his Atlanta, Georgia residence in order to discuss the possibility of Toub opening a commodity futures trading account with Apache. Chaskelson informed Toub that if Toub participated in Apache's Futures Long Term Trading Program

---

1. Harvey Toub named Chaskelson as a respondent in his complaint with the Commodity Futures Trading Commission, but the Commission dropped Chaskelson from the case because Chaskelson was not a properly registered futures commission broker.

("FLT" program), he would receive a year's worth of advisory services based on "technical analysis" and with unlimited trading privileges in exchange for a one-time "advisory fee." This advisory fee would vary according to the amount of money invested and the number of futures contracts the customer purchased. As further incentive for investment, Chaskelson told Toub that Apache was "on top of the market," with people observing the futures market for minute-by-minute changes. Apache's FLT program attempted to predict market price direction according to historical price data. Accordingly, Apache could inform Toub at any time of price changes affecting his position and give him trading advice based on those changes and Apache's analysis of its accumulated price data. Subsequently, Chaskelson mailed Toub a brochure containing similar representations.

In May of 1983, Toub opened a gold futures account in Apache's FLT program account by mailing $10,000 to Apache; Apache immediately deducted $3,300 as an advisory fee while the remainder was equity towards margin and commodities futures contracts. Between May and August 1983, Toub spoke to Apache representatives Chaskelson and Kevin Lynn [2] on the average of twice a week to discuss his account, trading strategy and the price of his trades. Chaskelson and Lynn always advised him to hold his gold position even though the gold market fluctuated greatly during this period. During these conversations, Chaskelson and Lynn encouraged Toub to purchase other futures contracts with an additional $3,300 advisory fee per contract. Toub refused.

Eventually, a dissatisfied Toub directed Mike Safer, Lynn's supervisor, to liquidate his account. After Safer unsuccessfully tried to get Toub to buy a soybeans FLT contract, he liquidated Toub's account on August 8, 1983. One week later, Toub received a check from Apache for $3,380.02, the remainder from his $10,000 investment.

2. Chaskelson left Apache's employ in July 1983, and Kevin Lynn, another representative of

On October 11, 1983, Toub filed a complaint with the Commodity Futures Trading Commission (Commission), alleging that Apache had not made the trading recommendations that it had promised in the FLT contracts, that Toub's requests to sell his position were ignored, and that Apache's personnel had not managed his account as he had expected. Toub asked for a total of $6,619.98 in damages, the $3,300 advisory fee charged by Apache plus the $3,319.98 Toub lost in the futures market due to Apache's alleged failure to manage his account. In answer, Apache, Lynn, and Safer denied wrongdoing on their or Chaskelson's part and contended that Toub's losses were due solely to adverse market conditions.

Apache, Safer and Lynn requested the ALJ assigned the case to schedule the oral hearing in Fort Lauderdale, Florida, the location of Apache's headquarters and several of its witnesses. Toub asked the ALJ to schedule the hearing in Atlanta, his residence. The ALJ, because of travel budget restrictions for the Commission, indicated that the hearing would be held in Atlanta on April 22. He informed the parties that no continuances would be permitted unless all parties agreed to a hearing in Washington, D.C. at a later date.

On April 8, petitioners Apache, Safer and Lynn filed a motion for a continuance, contending that one of their "key" witnesses, Paul Clancy, had the flu and that he would still be recuperating on April 22. Petitioners alleged that Clancy's testimony was vital to their case because he was the person responsible for handling any problems arising in Toub's account at Apache. Moreover, Don Charles, an expert witness for Apache, would not travel the 800 miles to Atlanta. In the motion, Apache asked the ALJ to continue the hearing for thirty days and suggested Washington, D.C. as an alternative site.

On April 11, 1985, the ALJ denied the motion, finding that the evidence did not support petitioners' contention that Mr.

Apache, took over the account at that time.

Clancy was a key witness. Thereafter, petitioners filed a second continuance request which the ALJ also denied.

At the hearing in Atlanta on April 22, 1985, the ALJ heard testimony from complainant Toub, respondent Kevin Lynn, and Thomas Clancy, a vice president of Apache. After hearing all the testimony, the ALJ ruled in his initial decision that Toub had been fraudulently induced by Chaskelson to enter into the FLT agreement with Apache, in violation of Section 4b of the Commodity Exchange Act.[3] Apache's promise to provide extensive technical analysis in order to solicit an account but without the intent to perform this service constituted fraud in violation of section 4b of the Act. The action of Lynn and Safer in attempting to solicit additional contracts from Toub while advising him to do nothing with his gold futures contract perpetuated the fraud. Consequently, the ALJ awarded Toub $6,619.98, the amount of his total losses plus prejudgment interest and the amount of the filing fee.

Apache, Lynn, and Safer appealed the ALJ's ruling to the Commodity Futures Trading Commission, but the Commission refused to overturn the ALJ's findings. Additionally, the Commission found that the scheduling of the hearing in Atlanta in April, 1985, constituted neither a denial of petitioners' due process rights nor an abuse of discretion on the part of the ALJ.

## II. ISSUES

The petitioners then appealed the matter to this court under the jurisdiction of 7 U.S.C. § 18(e).[4] The petitioners raised two issues. First, the weight of the evidence did not support the ALJ's finding that Apache fraudulently induced Toub to open and to maintain a commodity futures trading account in violation of Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b (1982) and, second, the ALJ abused his discretion in holding an oral hearing in Atlanta, Georgia over the objections of pe-

---

**3.** Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b provides, in relevant part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatso-

ever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person ...

**4.** 7 U.S.C. § 18(e) provides as follows:

Any order of the Commission entered hereunder shall be reviewable on petition of any party aggrieved thereby, by the United States Court of Appeals for any circuit in which a hearing was held, or if no hearing was held, any circuit in which the appellee is located, under the procedure provided in section 9 of this title. Such appeal shall not be effective unless within 30 days from and after the date of the reparation order the appellant also files with the clerk of the court a bond in double the amount of the reparation awarded against the appellant conditioned upon the payment of the judgment entered by the court, plus interest and costs, including a reasonable attorney's fee for the appellee, if the appellee shall prevail. Such bond shall be in the form of cash, negotiable securities having a market value at least equivalent to the amount of bond prescribed, or the undertaking of a surety company on the approved list of sureties issued by the Treasury Department of the United States. The appellee shall not be liable for costs in said court. If the appellee prevails, he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of his costs.

titioners.[5] We find against the petitioners on both issues.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

■ ▪ Petitioners contend that Toub's testimony contains inconsistent and contradictory statements, so the ALJ's credibility finding in favor of Toub should be overturned on appeal. Petitioners emphasize as the most significant inconsistency the fact that Toub complained that Apache disobeyed his instructions by failing to sell his gold contract when the price rose above $445. Apache introduced evidence from the Wall Street Journal that during the relevant time period, the price of gold did not rise above $445. Therefore, Toub was incorrect when he `charged that Apache's failure to sell constituted further evidence that petitioners were not abiding by their contractual obligations. The ALJ found against Toub on this matter, but the ALJ also determined that Chaskelson mistakenly admitted that he had failed to execute the order properly. Therefore, Toub's "untruthfulness" was not simply of his own making.

Furthermore, Apache lists eight instances where Toub was unsure or incorrect in his recollection of his dealings with Apache. First, Toub is uncertain whether Chaskelson called him "out of the blue" or whether Toub contacted Apache in response to some promotional material sent him by Apache. Second, Toub testified that Apache required a minimum of three contracts in its FLT program while the FLT brochure states the minimum as one. Eventually, Toub bought only one contract. Third, at one point in his testimony, Toub indicated that he was displeased with the market price of the gold position purchased by Apache. On cross-examination by Apache, Toub admitted that he did not set a specific price for petitioners to purchase gold. Fourth, Toub testified that he could expect as many as 25 trades but that 15 would be the number of trades he could reasonably expect at a minimum, but on cross-examination, Toub admitted that there was no limitation to the number of trades in the FLT program. Fifth, Toub was unsure when he first realized that Apache was acting fraudulently. He suggested three different dates, and the ALJ did not determine the exact time. Sixth, Toub was uncertain when he first spoke with Lynn, the branch manager of Apache. Seventh, Toub did not produce records of his toll-free calls in fulfillment of petitioners' documents request. Toub had earlier stated that he had great difficulty reaching petitioners in August in order to get them to sell his investment. Petitioners wanted Toub's records of all calls to Apache in order to disprove this contention. Toub stated that he had not provided the records because he had not understood the request. Eighth, Toub insisted that he was not a sophisticated investor and that he only spent one percent of his time on investments. Toub, however, admitted that he devoted an hour a day to reading the Wall Street Journal and reviewing his investments. The ALJ noted that Toub had a background in securities investment but found that Toub was not a sophisticated investor.

The issue of credibility will not be disturbed on appeal, unless the party seeking review can demonstrate clear error. *Stoller v. Siegel Trading Co.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,201, 29,206 (CFTC June 6, 1984). In reviewing the case, the Commission found the "asserted inconsistencies [in Toub's testimony] do not undercut the ALJ's findings of fraudulent solicitation" and that no "clear error" had been shown in the ALJ's evaluation of Toub's credibility. The ALJ had the opportunity to hear Toub's testimony firsthand and judge his credibility. The errors cited by petitioners

---

5. Petitioners also suggested that the ALJ improperly premised section 4b liability on the conclusion that Apache's brokerage commission fee was excessive. Petitioners misread the ALJ's opinion. Although the ALJ commented on the difficulty Toub would have in making a profit on his investment while paying a $3300 advisory fee, the ALJ's opinion and the Commission's opinion affirming the ALJ's decision clearly stated that petitioners' liability was based on its fraudulent representations about its advisory services, not on the price it charged.

do not destroy Toub's credibility, but only show that Toub's memory is unclear on some points. The ALJ did not commit clear error by deciding Toub had not lied about his treatment by Apache.

■ Alternatively, petitioners maintain that Toub's testimony supports a breach of contract action, not a fraudulent contract case. If Apache promised advisory services without the intention or ability to perform such services, then fraud occurred. If Apache intended in good faith to provide advice based on special expertise at the time Apache made the promise, the subsequent default was only a breach of contract. *See Wills v. First Financial Corp. of America,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,605 (CFTC May 31, 1985). To convince Toub to open a commodities futures account, petitioners promised him minute-by-minute information on the commodities futures market. Moreover, an expert at Apache was supposed to use historical price data to plot and predict the positions of the market. At the hearing before the ALJ, Apache presented no evidence that it had the capability to receive and utilize such sophisticated data at the time it promised such services to Toub.[6] The ALJ did not err by

finding the evidence supported a fraud action.

■ Additionally, petitioners contend that there is no evidence on which to hold Safer and Lynn liable. Although the ALJ voiced concern at the hearing as to their liability, the ALJ, after reviewing the entire record, found them liable. Toub testified that when he spoke to Lynn or Safer, they just tried to sell him more FLT contracts with the attendant $3,300 advisory fee. The ALJ concluded that although Chaskelson made the initial promises about advanced technical analysis, Lynn and Safer participated in and perpetuated Apache's fraud in their dealings with Toub. The evidence supports the ALJ's conclusion.

## B. *Due Process*

■ Finally, petitioners contend that they were denied due process because the ALJ conducted the hearing in Atlanta, where Toub lives, and because the ALJ denied petitioners' motion to continue. Under the Commission's rules in effect in 1983,[7] the oral hearing for a reparations proceeding is to be held where the petitioners are engaged in business. 17 C.F.R. 12.71(d) (1983). According to petitioners,

6. At the hearing before the ALJ, Thomas Clancy, vice president for trading at Apache, brought in an exhibit (Respondent's Exhibit No. 1) plotting the price of gold from May through August of 1983. Clancy testified that the source of the information was the Wall Street Journal. (Record at p. 79). On cross-examination about the exhibit, Clancy testified as follows:

Q: Is this what you consider to be the technical analysis that is called for by the contract with Mr. Toub, Exhibit C–3?
A: Yes.
Q: Was there any other aspect of technical analysis that was done by you or any other person associated with Apache in regard to Mr. Toub's program other than this?
A: Not that I am aware of.
(Record at pp. 94–95).

Later, Clancy attempted to backtrack from that position. He stated that Apache had quote machines, and from the high/low quotes he received, Clancy would draw forty-five degree angle lines to predict the future trends of the market. (Record at pp. 100–103).

At the conclusion of the hearing, the ALJ stated the following:

I can't see that there was any technical analysis made by Apache ... I still feel that

the base that they showed that he prepared some historical price date to present at this hearing, and that was the whole substance of Respondent's showing of technical information, and then they kept on and on and on, and finally got in that there was a quote machine that you drew a hypothetical forty-five degree angles and things of this sort, but that technical information is just fly by the seat of your pants type information. It certainly had no real analysis. It was just completely devoid as far as I'm concerned—devoid of substance, I guess I should say.
(Record at p. 132).

7. 17 C.F.R. Part 12 codifies the Commodity Futures Trading Commission's rules relating to reparation proceedings. These rules apply to any reparation proceedings filed on or after April 23, 1984. 17 C.F.R. § 12.2(c) (1986). The former reparations rules, 17 C.F.R. Part 12 (1983), "apply to any matter on the Commission's reparations docket pending on April 23, 1984," unless specifically exempted by the current rules. *Id.* Toub filed his reparation action on October 11, 1983, and, therefore, the former reparation rules apply.

the rule refers to the location the commodities business operated from, not the location of a customer contacted by mail and telephone. Apache maintains that its only contact with Atlanta was through telephone calls and mail to Toub. In Apache's view, such contacts do not result in Apache doing business in Atlanta. The Commission's interpretation of "engaged in business" does not support this position. For the purposes of the Commission's reparations program, mail and telephone contacts with a customer at the customer's residence constitute being "engaged in business." *Harvey v. Seevers,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,816 at 23,325 (N.D.Ill.1979) *aff'd* 626 F.2d 27, 29, 32 (7th Cir.1980) (holding that similar contacts were sufficient to be "engaged in business" under former § 14(b) of the Act.)

 Under the second part of its due process claim, petitioners allege that setting the hearing in Atlanta prejudiced petitioners because they were unable to produce certain witnesses who would not or could not travel to Atlanta, Georgia. Petitioners do not detail how they would be prejudiced or who their witnesses were and what the witnesses' testimony would have been. Apache *did not attempt to subpoena the witnesses, see* 17 C.F.R. § 12.74 (1983), *or to obtain the testimony through a deposition, see* 17 C.F.R. § 12.64(c) (1983), by affidavit, *see* 17 C.F.R. 12.80(f) (1983), by stipulation, *see* 17 C.F.R. § 12.80(g) (1983), or by another means. The ALJ did not abuse its discretion by holding the hearing in Atlanta when petitioners only made unsupported allegations of prejudice without any suitable explanation why alternate forms of testimony could not be used. Moreover, petitioners agreed to appear in Washington, D.C. Petitioners do not explain why their witnesses are willing to travel the greater distance to Washington, D.C., rather than to Atlanta. The motion for continuance and change of the place of the hearing appear to be only an attempt to inconvenience Toub. The ALJ did not commit harmful error by holding the hearing in Atlanta.

## IV. CONCLUSION

The weight of the evidence supports the ALJ's finding of fraudulent misrepresentation by petitioners when convincing Toub to open a commodities futures account. The ALJ did not commit clear error by finding Toub's story credible, despite certain inconsistencies and errors in Toub's testimony. We also hold that the ALJ did not abuse his discretion by scheduling the reparations hearing in Atlanta, especially when petitioners presented no facts to justify a change in the hearing location.

For the foregoing reasons, Apache, Lynn and Safer's petition to set aside the reparation award in favor of Toub is DENIED.