833 F.2d 909
 Blue Sky L. Rep. P 72,676, Fed. Sec. L. Rep. P 93,545
W. Floyd MESSER, Sr., individually, Plaintiff-Appellant,
v.
E.F. HUTTON & CO., a Delaware corporation, Raphael M. Kelly,
individually, Henry Herschaft, individually,
Defendants-Appellees.
 No. 86-3602.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 7, 1987.
 
 A. August Quesada, Jr., Wildt, Quesada & Walker, Jacksonville, Fla., for plaintiff-appellant.
 Nicholas V. Pulignana, Jr., Mattox S. Hair, Delbridge L. Gibbs, Mary C. Wood, Marks, Gray, Conroy & Gibbs, Jacksonville, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before JOHNSON and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This is an appeal from a district court order granting defendant-appellee E.F. Hutton's motion for a judgment notwithstanding the verdict. The order set aside a large part of the jury's award of both compensatory and punitive damages resulting from two unauthorized trades in plaintiff-appellant Floyd Messer's brokerage account. Messer contests the district court's determinations on both liability and damages and its denial of attorneys' fees, costs and prejudgment interest. We affirm.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 2
 In August 1980 appellant Messer opened a brokerage account at E.F. Hutton's Jacksonville office. Shortly afterwards he began trading United States Treasury Bond ("T-bond") futures. Believing that the bonds would increase in value in the future with a change in interest rates, he assumed a "long" position in T-bond futures by entering into fifty-five contracts to purchase T-bonds scheduled to come due later that year.[1]
 
 
 3
 In April 1981 the market began to turn against Messer's long position in T-bond futures. On April 22, 1981, E.F. Hutton traded on Messer's account and assumed a short position on several T-bond futures contracts to balance Messer's long position and thereby protect the account. The next day, April 23, Hutton repurchased the T-bond futures, placing Messer back in his original long position, but not before the account incurred a loss of $35,733.25.[2] It is undisputed that E.F. Hutton made these trades without Messer's authorization.
 
 
 4
 The value of Messer's long position in T-bond futures continued to drop precipitously. By April 29, 1981, Messer faced a margin call of $80,000 and projected losses in excess of his credit limit at E.F. Hutton. Desiring to avoid further losses in Messer's account, E.F. Hutton placed a straddle on his account on April 29, selling short fifty-five T-bond futures to offset the declining value of the fifty-five T-bond futures Messer held in a long position.[3] E.F. Hutton was unable to obtain Messer's prior authorization because Messer was away on business.
 
 
 5
 Messer telephoned his account representative at E.F. Hutton the next day and was told that Hutton had placed a straddle on his account. A "couple of days" later the account representative contacted Messer and told him that E.F. Hutton would waive its commission and remove the straddle if Messer would make the margin call. Messer refused to accept E.F. Hutton's offer and did not trade on the account at all until May 4, 1981.
 
 
 6
 Messer subsequently brought suit to recover the damages resulting from the April 22 and April 29 unauthorized trades, naming three defendants: 1) E.F. Hutton; 2) Raphael Kelly, the manager of Hutton's Jacksonville office; and 3) Henry Herschaft, the commodities director of the Jacksonville office. The complaint stated federal causes of action under the Securities Exchange Act and the Commodity Exchange Act, as well as pendant state law claims of breach of contract, breach of fiduciary duty, fraud, civil conversion, and violation of the Florida Securities Act. As relief, Messer requested an award of lost profits and punitive damages.
 
 
 7
 The jury found E.F. Hutton liable on all counts and awarded Messer $401,014.50 in compensatory damages and $500,000 in punitive damages. The jury did not find either Kelly or Herschaft liable on any of the counts.
 
 
 8
 Hutton then filed a motion for a new trial, for remittitur, and for judgment n.o.v. The district court granted the judgment n.o.v. on all of the counts except the breach of contract claim, holding that Messer had failed to establish a claim under any of the other causes of action in the complaint. As for the breach of contract claim, the court found that Messer's failure to mitigate his damages barred any recovery for the April 29 straddle and, in the alternative, that his proof of damages was speculative. The court also set aside the award of punitive damages. With the court's rulings on compensatory damages for the April 29 transaction and the punitive damage award, Messer was left with only compensatory damages resulting from the April 22 transaction. Accordingly, the court entered judgment in favor of Messer for $35,733.25, the amount representing the damages resulting from the April 22 transaction.[4] This timely appeal followed.
 
 II. DISCUSSION
 
 9
 Our task in considering whether a judgment notwithstanding the verdict was appropriately entered in this case is to determine whether all of the evidence and inferences point so strongly and overwhelmingly in favor of the defendant on the claims at issue that reasonable men could not arrive at a verdict for the plaintiff. Keiser v. Coliseum Properties, Inc., 764 F.2d 783, 785 (11th Cir.1985); Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969). Entry of judgment notwithstanding the verdict is inappropriate where there is substantial evidence opposed to the motion--that is, evidence of such quality and weight that reasonable and fair minded men might reach different conclusions. Keiser, supra, 764 F.2d at 785. A mere scintilla of evidence in opposition to the motion is insufficient to withstand a judgment n.o.v. Boeing, supra, 411 F.2d at 374. Applying this standard to the evidence presented at trial in this case, we proceed to examine seriatum each aspect of the district court's judgment n.o.v. challenged by Messer in this appeal.
 
 A. SECURITIES EXCHANGE ACT OF 1934
 
 10
 Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." 15 U.S.C.A. Sec. 78j(b); see Sante Fe Industries v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Rule 10b-5, promulgated by the Securities Exchange Commission under Section 10(b), prohibits any "artifice to defraud" or any act which "operates or would operate as a fraud or deceit." 17 C.F.R. Sec. 240.10b-5. Messer contends that E.F. Hutton's representation to him when he opened his account that it would execute transactions in his account only upon his direction was a material misrepresentation actionable under Section 10(b) and Rule 10b-5. The jury agreed, finding in favor of Messer on this claim.
 
 
 11
 The district court set aside the jury verdict on the Securities Act claim on the grounds that under Florida law, the promise of future action standing alone does not constitute actionable fraud. Although we agree with the result reached by the district court, we disagree with its method of reaching that result. While the district court correctly noted that the promise of future action alone does not constitute fraud under Florida law, see, e.g., Cavic v. Grand Bahama Development Co., 701 F.2d 879, 883 (11th Cir.1983) (applying Florida law), activities can be actionable under the Securities Exchange Act's antifraud provisions even though they are not " 'precisely and technically sufficient to sustain a common law action for fraud and deceit.' " Woodward v. Metro Bank of Dallas, 522 F.2d 84, 93 n. 20 (5th Cir.1975) (quoting Herpich v. Wallace, 430 F.2d 792, 802 (5th Cir.1970)). Liability under the Act does not depend on whether the activity in question would support a common law fraud action, but upon whether the activity constitutes "a misleading or deceptive practice" in the "special Rule 10b-5 sense of the word [fraud]." Woodward, supra, 522 F.2d at 93. Contrary to the district court's determination, a false promise to perform an act in the future can constitute a "misleading and deceptive practice" under the Act if the promise is part of the consideration for the sale of securities. Pross v. Katz, 784 F.2d 455, 457-58 (2d Cir.1986); McGrath v. Zenith Radio Corp., 651 F.2d 458, 466 (7th Cir.), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981).
 
 
 12
 This determination alone does not, however, resolve the question of whether a judgment n.o.v. was properly entered on Messer's Securities Act claim. Given that a fraudulent promise to perform future acts can be the basis of a claim under the Act, Messer's theory of liability under Section 10(b) and Rule 10b-5 presents two possible predicates for liability: 1) the opening of the account itself; and 2) the unauthorized trades. Because we conclude that neither of these predicates can support a verdict in favor of Messer on his Securities Act claim, we affirm the district court's entry of a judgment n.o.v.
 
 
 13
 The first possible predicate for liability--misrepresentations in connection with the opening of the account itself--does not support a verdict in favor of Messer under Section 10(b) and Rule 10b-5 because the account itself does not constitute a security within the meaning of the Act. Section 10(b) and Rule 10b-5 only extend to misleading or deceptive practices in connection with the purchase or sale of a security. 15 U.S.C.A. Sec. 78j(b); see Woodward v. Metro Bank of Dallas, 522 F.2d 84, 91 (5th Cir.1975). A trading account is a "security" within the meaning of the securities laws if it constitutes an "investment contract": i.e., investment of money in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); Moody v. Bache & Co., 570 F.2d 523, 525 (5th Cir.1978).
 
 
 14
 This Circuit's predecessor Circuit addressed the question of when a commodity futures trading account constitutes an "investment contract" in Moody v. Bache & Co., supra. In that case the court held that certain commodities futures trading accounts can constitute an "investment contract" within the meaning of the securities laws because they can potentially satisfy the definition of an investment contract: i.e., an investment in a common venture with dependence upon the entrepreneurial or managerial efforts of others. 570 F.2d at 526. The question of whether a trading account satisfies this definition turns on whether the broker has control over the profitability of the account (a "discretionary" account) or whether the investor himself has control (a "non-discretionary" account). See id.; accord, Hill v. Bache Halsey Stuart Shields Inc., 790 F.2d 817, 820 n. 3 (10th Cir.1986). A "non-discretionary" account cannot constitute an "investment contract" because:
 
 
 15
 An investor who [pursuant to the contract] has the ability to control the profitability of his investment ... by his own efforts ... is not dependent upon the managerial skills of others. Thus ... arrangements which grant the investors control over the significant decisions of the enterprise are not securities.
 
 
 16
 Gordon v. Terry, 684 F.2d 736, 741 (11th Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); see also Williamson v. Tucker, 645 F.2d 404, 419-20 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).
 
 
 17
 Messer's account with E.F. Hutton does not constitute a "security" because it was a non-discretionary account. A review of the record at trial clearly establishes that Messer, a self-made millionaire, was an experienced and knowledgeable investor who controlled the profitability of the account. Although Messer did occasionally seek advice from his account representative at E.F. Hutton, Messer and Messer alone clearly made the ultimate investment decisions.
 
 
 18
 Messer contends, however, that E.F. Hutton converted his account to a "discretionary" one when it seized control of the account and made the unauthorized trades at issue in this lawsuit. We cannot conclude, however, that the two isolated and atypical trades at issue in this case were enough to alter the fundamental non-discretionary nature of the account. That E.F. Hutton could and did execute a trade on Messer's account in limited situations does not make the account an investment contract because E.F. Hutton's limited authority did not extend to making the "undeniably significant" decisions or exercising the "essential managerial efforts which affect the failure or success of the enterprise." SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Accordingly, we conclude that Messer's trading account cannot be treated as a security, and thus any misrepresentations made in connection with its opening are not actionable under Section 10(b) and Rule 10b-5 because they were not made in connection with the purchase or sale of a security.
 
 
 19
 The second possible predicate for liability--the unauthorized trades themselves--also falls short of supporting a verdict in favor of Messer under Section 10(b) and Rule 10b-5. Unlike the trading account itself, a futures contract on a government security is a "security" within the meaning of the antifraud provisions of the securities laws. It is well established that a contract to purchase a security constitutes the purchase and sale of the security within the meaning of the antifraud provisions of the securities laws. 15 U.S.C.A. Sec. 78c(a)(14); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750-51, 95 S.Ct. 1917, 1932-33, 44 L.Ed.2d 539 (1975); Lutgert v. Vanderbilt Bank, 508 F.2d 1035, 1038 (5th Cir.1975). It is equally well established that United States government-issued treasury bonds are protected securities under Section 10(b) and Rule 10b-5. Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 10 n. 6, 92 S.Ct. 165, 168 n. 6, 30 L.Ed.2d 128 (1971); First National Bank of Las Vegas v. Estate of Russell, 657 F.2d 668, 672 & n. 14 (5th Cir.1981). It follows logically, then, that a contract to buy United States Treasury Bonds in the future constitutes a "security" subject to the antifraud provisions at issue here.[5] Cf. Abrams v. Oppenheimer Government Securities, Inc., 589 F.Supp. 4, 8-9 (N.D.Ill.1983) (futures contract for Ginnie Mae government securities constitutes a "security" subject to federal securities laws), aff'd, 737 F.2d 582 (7th Cir.1984).
 
 
 20
 Notwithstanding the fact that the transactions themselves involve the purchase and sale of "securities," we conclude that Messer failed to make out a case under Section 10(b) and Rule 10b-5 because he made no showing that E.F. Hutton made the unauthorized trades with the requisite scienter. The Supreme Court has held that Section 10(b) and Rule 10b-5 are not violated in the absence of a showing of scienter--an intent to deceive, manipulate or defraud. Sante Fe Industries v. Green, 430 U.S. 462, 473-74, 97 S.Ct. 1292, 1300-01, 51 L.Ed.2d 480 (1977); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); see also Gochnauer v. A.G. Edwards & Sons, 810 F.2d 1042, 1046 (11th Cir.1987); cf. Aaron v. SEC, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (SEC required to prove scienter in actions to enjoin violations of Section 10(b) and Rule 10b-5). This Circuit has held that the scienter requirement in securities fraud cases can also be satisfied with a showing of knowing misconduct or severe recklessness.[6] Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir.1985); Kennedy v. Tallant, 710 F.2d 711, 720 (11th Cir.1983). Severe recklessness and knowing misconduct are limited to
 
 
 21
 those highly unreasonable omissions or misrepresentations that involve not merely simple or inexcusable negligence, but an extreme departure from the standards of ordinary care.
 
 
 22
 Woods, supra, 765 F.2d at 1010 (quoting Broad v. Rockwell International Corp., 642 F.2d 929, 961-62 (5th Cir.) (en banc ), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). In applying this scienter requirement in the context of unauthorized trading on an account, we agree with the Ninth Circuit's opinion in Brophy v. Redivo, 725 F.2d 1218, 1221 (9th Cir.1984), that an unauthorized trade does not violate the antifraud provisions of the Securities Exchange Act unless it is accompanied by an intent to defraud or a willful and reckless disregard of the client's best interests. 725 F.2d at 1220-21; see, e.g., Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir.1971); cf. Lincoln Commodity Services v. Meade, 558 F.2d 469, 474 (8th Cir.1977).
 
 
 23
 A review of the record persuades us that no reasonable juror could have concluded that E.F. Hutton made the unauthorized trades with the requisite scienter. The record shows that E.F. Hutton made the unauthorized trades because the value of Messer's T-bond holdings was dropping precipitously and it wanted to protect the account. The record also shows that the trades were made without Messer's authorization because he was out of town and could not be reached at the time the decision had to be made. While opinions might differ on whether or not the decision to straddle the account was a good business decision, the expert testimony at trial established that straddling an investment is a common and accepted industry practice to protect an account against extreme losses. Far from supporting a finding that E.F. Hutton made the unauthorized trades with intent to defraud or reckless disregard for Messer's best interest, it appears that Hutton made a reasonable decision well within the bounds of accepted industry practice designed to protect the account.
 
 
 24
 Messer argues that a reasonable jury could have found that E.F. Hutton acted in reckless disregard of his interests because there was evidence that E.F. Hutton was motivated by a desire to protect itself. There is no real dispute that Hutton did in fact act to protect its own interests; however, that does not mean that in so doing E.F. Hutton acted in reckless disregard of Messer's interests. E.F. Hutton, who would have been liable for any margin call on Messer's investment, attempted to protect itself from liability by preventing a decline in the value of Messer's portfolio. Accordingly, Hutton's interests and Messer's interests were aligned rather than being antagonistical. While Messer now claims that the actions were not in fact in his interest, that does not alter the fact that the actions were not taken in disregard of his welfare. We conclude that no reasonable jury could have found that E.F. Hutton acted with the requisite scienter and accordingly that the jury verdict in favor of Messer on his securities act claim cannot stand.
 
 B. COMMODITIES EXCHANGE ACT
 
 25
 The district court entered a judgment n.o.v. on Messer's Commodities Exchange Act claim on the same grounds as the Securities Act claim: that fraud claims based upon promises of future action are not actionable under Florida law. Here, as with the Securities Act claim, it is clear that under certain circumstances a false promise to perform future services can support a claim under the CEA's antifraud provisions. See Apache Trading Corp. v. Toub, 816 F.2d 605, 610 (11th Cir.1987). Accordingly, we disagree with the district court's grounds for disposing of Messer's CEA claim. As with Messer's Securities Act claim, however, we affirm the result reached by the district court on different grounds.
 
 
 26
 Messer's claim under the Commodities Exchange Act ("CEA") arises under Section 6o (1), which states:
 
 
 27
 (1) It shall be unlawful for any commodity trading advisor ...
 
 
 28
 (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
 
 
 29
 (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.
 
 
 30
 7 U.S.C.A. Sec. 6o (1).
 
 
 31
 Messer's claim under Section 6o (1) presents the same two possible grounds for liability as his securities fraud claim under Section 10(b) and Rule 10b-5: the opening of the account and the unauthorized trades.[7] Neither the Supreme Court nor this Circuit has addressed the question of whether Section 6o (1) of the CEA contains a scienter requirement. After reviewing the language of the provision, interpretations of analogous statutes, and the sparse legislative history that accompanies Section 6o (1), we conclude that Section 6o (1)(A) contains the same scienter requirement as Section 10(b) and Rule 10b-5 of the securities laws while Section 6o (1)(B) does not require proof of scienter.
 
 
 32
 The focus of our analysis is the language of Section 6o. Because the case law indicates that subsections (A) and (B) under Section 6o (1) should be analyzed differently, we will discuss each subsection separately. Section 6o (1)(A) prohibits financial advisers from "employ[ing] any device, scheme, or artifice to defraud any client", language which closely tracks two other antifraud provisions, Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C.A. Sec. 77q(a)(1), and Section 206(1) of the Investment Advisers Act, 15 U.S.C.A. Sec. 80b-6(1). Both of these analogous provisions have been interpreted by binding precedent as requiring the same proof of scienter as is required to establish a violation of Section 10(b) and Rule 10b-5 of the securities laws. Aaron v. SEC, 446 U.S. 680, 695-96, 100 S.Ct. 1945, 1954-55, 64 L.Ed.2d 611 (1980) (interpreting Section 17(a)(1) of the Securities Exchange Act of 1933); Steadman v. SEC, 603 F.2d 1126, 1134 (5th Cir.1979) (interpreting Section 206(1) of Investors Advisers Act). There is nothing in the language, purpose or legislative history of Section 6o (1)(A) to justify giving it a different interpretation. See Bromberg & Lowenfels, Securities Fraud and Commodities Fraud Sec. 4.6(453). Accordingly, we conclude that proof of a violation of Section 6o (1)(A) requires proof of scienter.
 
 
 33
 Given this interpretation of Section 6o (1)(A), it follows that Messer's claim under this provision fails under the same analysis found above in the discussion of Messer's Section 10(b) and Rule 10b-5 claim. Here, as there, the record fails to provide an evidentiary basis for a reasonable juror to find that E.F. Hutton acted with the requisite scienter.[8]
 
 
 34
 The language of Section 6o (1)(B) reads slightly differently, prohibiting advisers from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client." (emphasis added). This language tracks Section 17(a)(3) of the Securities Act of 1933 and Section 206(2) of the Investment Advisers Act, which have been interpreted as not requiring proof of scienter. Aaron, supra, 446 U.S. at 697, 100 S.Ct. at 1956 (interpreting Section 17(a)(3) of the Securities Act of 1933); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) (interpreting Section 206(2) of Investors Advisers Act); see also Steadman, supra, 603 F.2d at 1134 (Section 206(2) of IAA). These courts reasoned that the phrase "operates as" focussed the force of the prohibition on the effect of the action rather than on the actor's state of mind, thereby indicating that Congress did not intend to require proof of scienter to establish a violation. Aaron, supra, 446 U.S. at 697, 100 S.Ct. at 1956; Capital Gains, supra, 375 U.S. at 195, 84 S.Ct. at 284. Again, we find no reason to distinguish the interpretations of these analogous statutory provisions from the interpretation of Section 6o (1)(B).
 
 
 35
 Even with this interpretation of Section 6o (1)(B), we conclude that no reasonable juror could have concluded that E.F. Hutton's actions in placing the straddle on Messer's account in fact "operate[d] as a fraud or deceit" upon Messer. Even given that E.F. Hutton breached its contract with Messer, as the jury found, it does not necessarily follow that the breach of contract operated as a fraud or deceit on Messer. The facts and circumstances surrounding the transactions do not establish a course of unauthorized trading taking place during normal market conditions, see, e.g., Haltmier v. Commodities Futures Trading Commission, 554 F.2d 556, 562 (2d Cir.1977), or a "churning" case where excessive trading is carried out in order to generate commissions, see e.g., Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1416-17 (11th Cir.1983), both situations which do involve deceit and fraud. In contrast, E.F. Hutton made two isolated trades within a short period of time in response to what it reasonably perceived to be a dangerously dropping market. While it undeniably made the trades without Messer's authorization, it did so at least in part because Messer was not available to authorize the trades or otherwise respond to the changing market situation. Messer was notified as soon as it was possible to notify him that the trades had in fact been made and was given the opportunity to restore the account to its original condition by posting the required margin. In addition, as previously noted, E.F. Hutton offered to waive its commission on the trades. No reasonable juror could conclude that these facts amount to fraud or deceit. Accordingly, we affirm the district court's entry of a judgment n.o.v. on Messer's CEA claim.
 
 C. FLORIDA SECURITIES ACT
 
 36
 Section 517.301(1)(a) of the Florida Securities Act, patterned after Rule 10b-5 of the federal securities laws, makes it unlawful for anyone
 
 
 37
 (1) To employ any device, scheme, or artifice to defraud;
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 (3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a person.
 
 
 41
 Like Rule 10b-5, the state provision only covers fraud "in connection with the offer, sale or purchase of a security." Fla.Stat. Sec. 517.301(1)(a). Section 517.301(1)(a) differs from the parallel federal provision, however, in that a violation of the state statute requires proof of negligence rather than scienter. Alna Capital Associates v. Wagner, 758 F.2d 562, 566 (11th Cir.1985); Merrill Lynch, Pierce, Fenner & Smith v. Byrne, 320 So.2d 436, 440 (Fla.App.1975), cert. discharged, 341 So.2d 498 (Fla.1976).
 
 
 42
 We conclude that the district court correctly entered judgment n.o.v. on this claim for the same reasons discussed above. Once again, Messer's claim under Florida securities law presents the same possible grounds for liability as his claim under the federal securities laws: misrepresentations in the opening of the account and unauthorized trades. The first ground fails to provide a basis for relief under state law for the same reason it fails under federal law: Messer's trading account does not constitute a "security" within the meaning of the statute. The definition of security under the Florida statute is the same as that under federal law. Phillips v. Kaplus, 764 F.2d 807, 815 n. 8 (11th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); Weiner v. Brown, 356 So.2d 1302, 1306 (Fla.App.), dismissed, 359 So.2d 1211 (1978). Accordingly, Messer's non-discretionary account with E.F. Hutton does not constitute a "security" under the Florida Securities Act for all of the reasons discussed supra in Section IIA of this opinion. Therefore, any misrepresentations or fraud in connection with the opening of the account are not actionable under the Florida Securities Act.
 
 
 43
 The second possible basis for relief, the unauthorized trades themselves, also fails to present a claim under the Florida Securities Act. Even though liability under Section 517.301 can attach upon a showing of negligence rather than upon a willful or reckless disregard of a customer's best interests, we conclude that no reasonable jury, considering the totality of the circumstances at the time, could have found that E.F. Hutton was even negligent in making the unauthorized trades. As discussed above, E.F. Hutton made two isolated trades within a short period of time in response to what it reasonably perceived to be a dangerously dropping market. Messer was notified as soon as it was possible to notify him that the trades had in fact been made and was given the opportunity to restore the account to its original condition by posting the required margin. These facts clearly establish that E.F. Hutton was exercising ordinary care in responding to exigent circumstances. While its decision to straddle the account might have been in breach of its contract with Messer, E.F. Hutton was not in any way negligent.
 
 D. FIDUCIARY DUTY
 
 44
 The district court also entered judgment n.o.v. on Messer's claim that the unauthorized trades breached the fiduciary duty of good faith that a broker owes to his clients. Under Florida common law, a stockbroker is charged with the duty of dealing with utmost honesty and good faith in his transactions on behalf of his client. Henderson v. Usher, 125 Fla. 709, 170 So. 846, 852 (1936); Hayden, Stone Inc. v. Brown, 218 So.2d 230, 235 (Fla.App.), cert. denied, 225 So.2d 539 (Fla.1969); see generally Fla.Jur.2d Brokers Secs. 64-71. The stockbroker has breached this duty where there is a showing of fraud, deceit or absence of good faith. Hayden, Stone, supra, 218 So.2d at 235. In discharging this duty of good faith, the stockbroker is bound to act in his client's best interest and is not permitted to take advantage of the fiduciary relationship to further his own interests. See Henderson, supra, 170 So. at 236.
 
 
 45
 We find that the district court properly entered judgment n.o.v. on this claim because there is no basis for a reasonable juror to conclude that E.F. Hutton's actions in placing the straddles on Messer's account were fraudulent, deceitful, or otherwise in breach of its fiduciary duty. As discussed above, it is undisputed that E.F. Hutton placed the straddle to protect Messer's interests in the face of a precipitously declining market. Rather than acting against Messer's best interests, E.F. Hutton was acting to protect Messer's interests. Nor is there any evidence that E.F. Hutton made the trades to benefit itself at Messer's expense: it waived its commission on the trades and benefited otherwise only to the extent that Messer also benefited by preserving the value of the account. In addition, the evidence shows that E.F. Hutton informed Messer that it made the trades as soon as practicable and gave him every opportunity to restore the account to its original state. See Hayden, Stone, supra, 218 So.2d at 236. We conclude, therefore, that no reasonable juror could have found that E.F. Hutton breached its fiduciary duty to Messer in making the unauthorized trades.
 
 E. CIVIL CONVERSION
 
 46
 The final theory of recovery at issue in this appeal is Messer's claim that the unauthorized trading in his account constituted civil conversion in violation of Fla.Stat. Sec. 812.014.[9] The district court also granted judgment n.o.v. in E.F. Hutton's favor on this claim. We affirm.
 
 
 47
 Section 812.014 of the Florida code provides:
 
 
 48
 A person is guilty of a theft if he knowingly obtains or uses, or endeavors to obtain or use, the property of another, with the intent to, either temporarily or permanently:
 
 
 49
 (a) deprive the other person of a right to the property or the benefit therefrom;
 
 
 50
 (b) appropriate the property to his own use or to the use of any person not entitled thereto.
 
 
 51
 Fla.Stat. Sec. 812.014. The phrase "obtains or uses" is defined in Section 812.012(2) as any manner of:
 
 
 52
 (a) taking or exercising control of property.
 
 
 53
 (b) making any unauthorized use, disposition, or transfer of property.
 
 
 54
 (c) obtaining property by fraud, willful misrepresentation of a future act, or false promise.
 
 
 55
 Messer argues that E.F. Hutton violated the civil theft statute because the unauthorized trades amounted to obtaining or using his property. Even if we assume arguendo that E.F. Hutton did in fact "obtain or use" Messer's property within the meaning of the statute, there is no evidence from which a reasonable juror could conclude that E.F. Hutton "obtain[ed] or use[d]" the property with the requisite intent. The statute provides for liability only if the property is used or obtained "with intent to, either temporarily or permanently, ... deprive the other person of a right to the property or the benefit therefrom ... [or] appropriate the property to his own use or to the use of any person not entitled thereto." Fla.Stat. Sec. 812.014(1). There is no evidence in the record which would allow a reasonable juror to find that E.F. Hutton acted with the requisite intent to deprive Messer of the use of his account or the benefit of the account or to appropriate the funds for its own benefit. All the evidence shows is that E.F. Hutton converted some of Messer's assets to another form of asset with the intention of protecting the value of Messer's portfolio. The evidence further shows that E.F. Hutton did not even benefit from the trade through generating a commission. Accordingly, we hold that the district court properly entered judgment n.o.v. on Messer's claim under the Florida civil theft statute.
 
 F. DAMAGES
 
 56
 Messer also challenges the district court's entry of judgment n.o.v. on various aspects of the jury's damages award. The district court set aside all but $35,733.25 of the jury's award of compensatory damages, an amount representing the breach of contract damages awarded for the first straddle. The court set aside the rest of the compensatory damages award, representing the amount of damages awarded for the second straddle, on the grounds that Messer's failure to mitigate damages from the second straddle constituted a complete bar to relief on any claim arising from that transaction. The court also set aside the compensatory damages award on the second transaction on the grounds that Messer failed to prove lost future profits with requisite certainty. Finally, the district court set aside the jury's award of punitive damages on the grounds that Messer's only surviving cause of action, breach of contract, did not provide a basis for a punitive damage award. Messer challenges all of these determinations. We affirm.
 
 
 57
 It is well established under Florida law that a party cannot recover damages he could have prevented through the exercise of reasonable care and diligence. Graphic Associates v. Riviana Restaurant Corp., 461 So.2d 1011, 1014 (Fla.App.1984); Jenkins v. Graham, 237 So.2d 330, 332 (Fla.App.1970). We conclude that no reasonable juror could have concluded anything other than that Messer failed to mitigate his damages in their entirety. Even though the second straddle was placed on the account on April 29 and Messer was notified of the straddle on April 30, Messer did not act to remove the straddle until May 4, when he resumed trading on the account. At the time E.F. Hutton notified Messer that a straddle had been placed on his account it also told Messer that it would remove the straddle immediately if he could meet the margin call. He repeatedly declined the offer.
 
 
 58
 Messer argues that he did not act to remove the straddle because he was unaware of the legal and financial consequences of doing so. Accepting Messer's contention as true, it was certainly not unreasonable for Messer to decline E.F. Hutton's offer until he knew its implications to him. The evidence is uncontradicted that no one at E.F. Hutton explained to Messer the financial or legal effect of eliminating the straddle.
 
 
 59
 That is not to say, however, that Messer's continued failure to mitigate damages was reasonable. Messer never asked the E.F. Hutton brokers, who repeatedly called Messer, about the consequences of eliminating the straddle and even refused to discuss the matter with them. Further, there is no evidence that Messer discussed the matter with anyone else or otherwise tried to get information about the effect the straddle had on his account. Although Messer's refusal to lift the straddle might have been reasonable at the outset, it was unreasonable for him to continue to refuse E.F. Hutton's offer without even inquiring into the matter. Certainly he should have taken some action by May 4, 1981, when he voluntarily resumed trading in T-bond futures. At that point it was foolhardy to authorize trades without being informed of the consequences of the straddle.
 
 
 60
 Furthermore, the uncontradicted evidence shows that, until at least May 4, the straddle actually saved Messer money. Accordingly, even if Messer's failure to mitigate damages could be deemed reasonable for a short period after the April 29 transaction, he suffered no damages during that period. Any damages occurred only after Messer resumed trading in his account. At that point, however, Messer's failure to at least inquire about the straddle was clearly unreasonable. Accordingly, no reasonable juror could have concluded anything other than that Messer's failure to mitigate damages barred his recovery as to the April 29 transaction.
 
 
 61
 The district court also set aside the jury's compensatory damages award relating to the second transaction on the grounds that damages were not proven with reasonable certainty. Messer's claimed damages consisted of lost future profits: i.e., the gain he would have reaped on his long positions in T-bond futures had his account not been straddled with offsetting short positions. Proof of those losses was premised on Messer's following an investment plan devised by his broker at E.F. Hutton that would have required Messer to maintain his long position, rolling the futures over into new contracts when they came due, until the interest rate and the bond prices reached a certain level. The district court, finding that Messer had no "track record" for following such a plan, analogized from the treatment of lost business profits and held that the proof of damages was speculative.
 
 
 62
 We hold that the district court correctly set aside the jury's damages award as speculative. As the district court correctly observed, damages for lost anticipated profits in commercial enterprises are considered speculative absent an established business and history of profits. See, e.g., Wash-Bowl, Inc. v. Wroton, 432 So.2d 766, 767 (Fla.App.1983); Innkeepers International, Inc. v. McCoy Motels, Ltd., 324 So.2d 676, 679 (Fla.App.1975), cert. denied, 336 So.2d 106 (Fla.1976). This principle disallows the assessment of damages where the court cannot tell how successful, if at all, the business practices relied on would be. While the existence of a programmed investment plan which incorporates a predetermined response to market conditions might enable a court to calculate lost profits with some certainty, it can only do so with some proof that the investor would in fact follow the investment plan.
 
 
 63
 Here, there is little reason to believe that Messer would have followed E.F. Hutton's investment plan. Messer had never before followed Hutton's investment plan and Messer's trading pattern--daily arbitraging--was completely opposite the buy and hold pattern outlined in the plan. Furthermore, there is little reason to believe that Messer would have stayed with the plan to the point it became profitable. If Messer had followed the plan, he would have suffered extreme intermediate losses over $200,000 in excess of his credit limit at E.F. Hutton. Finally, the evidence at trial showed that Messer did not in fact follow the plan when he resumed trading in his account. Even though he had an opportunity to restore the account to its original condition he did not do so. Nor did he resume the plan when he resumed active trading in his account on May 4.
 
 
 64
 Messer argues that his proof of damages is not speculative because damages need not be measured with "absolute exactness." Royster Co. v. Union Carbide Corp., 737 F.2d 941, 948 (11th Cir.1984). The problem with Messer's proof of damages, however, is not the measurement of damages but their causation. Unless a plaintiff can show with reasonable certainty that the defendant's wrongful conduct proximately caused damages, questions of measurement never arise. See id. Since Messer cannot show with reasonable certainty that he would have followed E.F. Hutton's investment plan, he cannot prove that the April 29 unauthorized trade proximately resulted in lost future profits. Accordingly we affirm the district court's entry of judgment n.o.v. on this issue as well.
 
 
 65
 Finally, the district court set aside the jury's assessment of punitive damages on the grounds that Messer's sole surviving cause of action, breach of contract, did not entitle him to punitive damages. Messer argues that the district court's decision to set aside the punitive damage award is erroneous because a reasonable jury could have found that E.F. Hutton acted wantonly and recklessly in making the unauthorized trades. Aside from the fact that we have already concluded that no reasonable jury could find that E.F. Hutton acted wantonly or recklessly, it is well established under Florida law that "[p]unitive damages are not recoverable for breach of contract, notwithstanding the oppressive nature of the breach." Rosen v. Marlin, 486 So.2d 623, 626 (Fla.App.), review denied, 494 So.2d 1151 (Fla.1986). Accordingly we affirm the district court on this point as well.
 
 G. ATTORNEY'S FEES AND PREJUDGMENT INTEREST
 
 66
 In his final two contentions on appeal, Messer argues that the district court erred in refusing to award him attorneys' fees and prejudgment interest on the $35,773.25 awarded for the breach of contract arising out of the April 22 transaction. As for the first contention, Florida adheres to the American Rule under which attorneys' fees are awarded only where authorized by contract or statute. See, e.g., Dorner v. Red Top Cab & Baggage Co., 160 Fla. 882, 37 So.2d 160, 161 (1948); Cook v. Deltona Corp., 753 F.2d 1552, 1563-64 (11th Cir.1985) (applying Florida law). The Customer Agreement did not provide for the award of attorneys' fees; therefore, Messer cannot recover attorneys' fees on his breach of contract claim.
 
 
 67
 As for the second contention, the rule in Florida is that prejudgment interest can be awarded from the date of the breach if the amount of liability is fixed and ascertainable on that date, i.e., if the claim is liquidated. Cook, supra, 753 F.2d at 1564 (applying Florida law). A claim is unliquidated when the amount of damages depends upon conflicting evidence, inferences and interpretations. Town of Longboat Key v. Carl E. Widell & Son, 362 So.2d 719, 722-23 (Fla.App.1978). Since the damages on the April 22 transaction were not ascertainable at the time of the breach, but depended upon how long E.F. Hutton left the straddle in place and how the market behaved at the time, the claim was unliquidated. Accordingly, we affirm the district court's decision to deny prejudgment interest on the damages awarded for the April 22 transaction.
 
 
 68
 Accordingly, for the reasons given above, the decision of the district court is AFFIRMED.
 
 CLARK, Circuit Judge, specially concurring:
 
 69
 Although I agree with the result reached in this case, I write separately because I believe that the majority through dicta promulgates a number of legal principles that are unnecessary to resolution of the issues.
 
 
 70
 Near the end of its opinion, the majority concludes that by placing the April 29 straddle on Messer's account, E.F. Hutton saved Messer money. It also concludes that Messer's failure to remove the straddle prior to May 4 prevents him from recovering any damages for losses which occurred between April 29 and May 4. With these two conclusions I agree. Given this state of affairs, Messer could have presented no facts entitling him to relief based on the theories of his lawsuit. The majority, however, has taken a different approach.
 
 
 71
 Under the law of this circuit, a Rule 10b-5 plaintiff must prove causation. Part of the causation analysis, sometimes referred to as "transaction causation," is related to the reliance element necessary to a Rule 10b-5 cause of action. Courts sometimes refer to the second component of the Rule 10b-5 causation analysis as "loss causation." See Huddleston v. Herman & MacLean, 640 F.2d 534, n. 24 (5th Cir. Unit A Mar. 1981). Thus, a plaintiff must show that the defendant's misrepresentation or omission was in some way responsible for his losses. The alleged misrepresentation in this case, that Messer's account was to be nondiscretionary, in no way "touche[d] upon the reasons for [his] investment's decline in value." Id. at 549. Even if Messer did show that his investment decision was induced by material misstatements by Hutton, his inability to prove that these misstatements were the proximate cause of his pecuniary loss made it impossible for him to recover under rule 10b-5. It is therefore unnecessary that the court decide whether a nondiscretionary account such as Messer's can be "converted" into a discretionary account, so as to render that account an "investment contract" and hence a "security" for the purpose of the federal securities laws. The court cites no real authority for this proposition. S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), which involved a pyramid marketing scheme, in no way touches upon this question.
 
 
 72
 The court's analysis of the second predicate for liability under Rule 10b-5 is equally problematic where it concludes that Messer did not prove scienter or recklessness. While I agree that Messer did not show that Hutton acted with a reckless disregard for his best interests, I disagree with the majority's analysis because it suggests that unauthorized trading cannot be reckless where a broker believes he is acting to protect his client. The majority also concludes that Hutton "wanted to protect the account." In my view, this was a jury question. Again, I would affirm the district court's granting of judgment notwithstanding the verdict because Messer could not prove that Hutton's acts caused his losses.
 
 
 73
 In its analysis of Messer's Commodity Exchange Act claim, the court concludes that a cause of action under the Act's antifraud provision, 7 U.S.C. Sec. 6o (1), includes a scienter element. Instead of reaching this unsettled question of law, which unnecessarily puts the court at odds with a sister circuit, see Commodities Future Trading Commission v. Savage, 611 F.2d 270 (9th Cir.1979), I would hold that Messer was not entitled to relief because he could not prove loss causation.
 
 
 74
 I agree with the remainder of the court's opinion, except for that portion of Section II(C) which concludes that Messer's trading account was not a security. My disagreement on this point is limited to the reasons expressed above; the court need not reach this question.
 
 
 
 [1]
 Assuming a "long" position in a futures market means that the investor contracts to buy a specific commodity (here, T-bonds) at a designated date in the future. Assuming a "short" position, on the other hand, means that the investor contracts to sell a specific commodity at a designated date in the future. The price on the contract is established at the time the parties enter into the agreement. The investor holding a long position on a futures contract makes money if the futures price increases in value in time between the original agreement and the date the contract comes due. See generally Leist v. Simplot, 638 F.2d 283, 286 (2d Cir.1980), aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); Note, Trading In Commodity Futures Using Nonpublic Information, 73 Geo.L.J. 127, 128 (1984)
 
 
 [2]
 This figure represents lost profits plus the commission charged for the transaction
 
 
 [3]
 Placing a "straddle" on a futures account involves making trades that place the investor in a neutral position. Here, E.F. Hutton contracted to sell 55 T-bond futures on Messer's account to neutralize Messer's existing contracts to buy 55 T-bond futures
 
 
 [4]
 The court subsequently amended its judgment to reflect that the judgment ran against E.F. Hutton only, but the court's amendment came after Messer had filed a notice of appeal. Consequently, another panel of this Court dismissed the appeal and remanded the case for the entry of a new order and judgment. The district court then vacated its two prior judgments and entered a new judgment against E.F. Hutton only
 
 
 [5]
 In contrast, the courts have universally held that futures contracts for commodities are not "securities" within the meaning of the antifraud provisions of the federal securities laws. See, e.g., SEC v. Continental Commodities Corp., 497 F.2d 516, 520 n. 9 (5th Cir.1974)
 
 
 [6]
 The Supreme Court expressly declined to decide the question of whether the Section 10(b)'s scienter requirement could be satisfied by extreme recklessness. Ernst & Ernst, supra, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12
 
 
 [7]
 Unlike Messer's Securities Act claim, however, the opening of the account itself could violate the CEA because Section 6o of the CEA, unlike Section 10(b) of the Securities Act, is not confined to fraud in connection with the sale or purchase of a commodity. Therefore, misrepresentations made in opening an account may constitute fraud on a prospective client
 
 
 [8]
 We take note that our decision on this question conflicts with the only other reported opinion by a United States Court of Appeals addressing this question, Commodities Futures Trading Commission v. Savage, 611 F.2d 270 (9th Cir.1979). In that case the Ninth Circuit held that Section 6o does not contain a scienter requirement by analogizing to the Supreme Court's reasoning in SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). 611 F.2d at 284. We depart from the Ninth Circuit's interpretation of Section 6o (1) on several grounds. First, the opinion did not make a distinction between subsections 6o (1)(A) and 6o (1)(B) and in so doing, failed to note that the decision in Capital Gains interprets only the provision of the Investors Advisers Act analogous to subsection 6o (1)(B). See Capital Gains, supra, 375 U.S. at 195, 84 S.Ct. at 284. Second, the opinion predates the Supreme Court's decision in Aaron v. SEC, supra, which drew a distinction between subsections 17(a)(1) and 17(a)(3) of the Securities Exchange Act of 1933, analogous to Section 6o (1)(A) and 6o (1)(B) respectively, and held that subsection 17(a)(1) contained a scienter requirement while subsection 17(a)(2) did not. Third, the Ninth Circuit's reasoning in concluding that there is no scienter requirement for Section 6o, to the extent it applies to subsection 6o (1)(A), is inconsistent with the reasoning in Steadman, supra, a case decided by our predecessor Circuit interpreting Section 206(1) of the Investors Advisers Act. In Steadman, the former Fifth Circuit rejected the argument that the fiduciary relationship protected by the IAA dictated that subsection 206(1) of the IAA did not require proof of scienter, and held that the clear language of the provision covered only intentional or willful conduct. For these reasons we disagree with the Ninth Circuit's analysis to the extent it applies to subsection 6o (1)(A) and is inconsistent with our reasoning here
 
 
 [9]
 Messer does not challenge the district court's entry of judgment n.o.v. on his common law fraud claim