**TAMPA PIPELINE TRANSPORT COMPANY, et al., Plaintiffs,**

v.

**CHASE MANHATTAN SERVICE CORPORATION, Defendant.**

No. 94–54–CIV–T–21(B).

United States District Court,
M.D. Florida,
Tampa Division.

March 27, 1995.

Richard Michael Zabak, Shackleford, Farrior, Stallings & Evans, P.A., Tampa, FL, for plaintiffs.

John H. Rains, III, Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, FL, for defendant.

## OPINION

THOMAS G. WILSON, United States Magistrate Judge.

This case, which features an unusual issue of mitigation of damages, arises from the remarkable misplacement of two promissory notes with a face value of more than 11 million dollars. The misplacement of the notes aborted a transaction which would have reduced the notes' interest rates. The plaintiffs, who are the makers of the notes, sued the defendant for breach of an agreement to assign the notes. I find, following a non-jury trial, that there was such an agreement, and that the defendant breached it. I find further, however, that, because the plaintiffs failed to take reasonable steps to avoid the consequences of the breach, the plaintiffs are not entitled to recover damages based upon a benefit-of-the-bargain theory. The plaintiffs are, nevertheless, entitled to recover expenses and prejudgment interest in the amount of $18,426.85.

I.

The plaintiffs, Tampa Pipeline Transport Company, and Tampa Bay Pipeline Company, are engaged in the business of transporting anhydrous ammonia by pipeline

to fertilizer producers.[1] In June 1987, each of the plaintiffs gave a promissory note to Contel Credit Corporation. The note from Tampa Bay Pipeline Company was in the amount of $5,300,000; earned interest of 10.25% after June 15, 1992; and matured on December 15, 1995 (Plt.Ex. 1). The note from Tampa Pipeline Transport Corporation was in the amount of $6,500,000; earned the same interest as the other note; and matured on December 15, 1996 (Plt.Ex. 2). Without prior notice to the plaintiffs, the notes were assigned, first, to Contel Corporation and, in October 1989, to defendant Chase Manhattan Service Corporation ("Chase") (Plt.Ex. 14).

Beginning in 1991, Robert L. Rose, the President of the two plaintiffs, sought an assignment by Chase because he desired to take advantage of decreasing interest rates and he wished to deal with a financial institution that would be more willing than Chase to provide additional services. This initial attempt, however, was unsuccessful.

In the fall of 1992, Rose reinstituted his efforts to obtain an assignment. During late 1992 and early 1993, he spoke with several financial institutions, including First Union National Bank of Florida, about refinancing the notes.

Finding a financial institution willing to take the notes was not the only problem Rose faced, however. The notes contained prepayment penalty provisions that, at the time of the events giving rise to this suit, would require the plaintiffs to pay an additional amount of about $400,000. A payment in that amount would make refinancing the notes unreasonable.

Rose had been told in 1991, however, that the plaintiffs' notes were in Chase's "unwanted" category (Plt.Ex. 16). Consequently, Rose negotiated in early 1993 with Kenneth E. Langille, the President of the defendant, about a proposed assignment. The two

agreed that Chase would assign the notes for a payment of $60,000, which was approximately 1% of the outstanding balance.

On February 4 and 10, 1993, Peter J. Kelly, the plaintiffs' attorney, sent letters memorializing the agreement reached between the parties, but the defendant made modifications to both (Plt.Exs. 22, 23). Langille, however, signed a letter agreement dated February 11, 1993 (Plt.Ex. 3).

The agreement provided that Chase would assign the notes to a financial institution of the plaintiffs' selection without recourse, warranty, or representation except as to its unencumbered ownership (Plt.Ex. 3). In return, the defendant would receive an assignment fee of $60,000, reimbursement of all expenses, and the principal amount of the notes, plus accrued interest (*id.*). The assignment was required to close by March 31, 1993 (*id.*).

Having gained Chase's approval, the plaintiffs obtained a commitment from First Union to take the notes. By letter dated February 23, 1993, First Union agreed to charge Tampa Transport Pipeline Company interest of 7.4%, and Tampa Bay Pipeline Company interest of 6.7% (Plt.Ex. 5). However, unlike the situation when the notes were held by Chase, First Union required that the loans be personally guaranteed by Rose, his wife, and a company named P K Ventures, Inc. (*id.*).

Unfortunately, this is where problems developed; Chase could not find the original notes. Thus, in gathering the documents for the assignment, Chase realized by at least February 25, 1993, that the original notes were missing (Plt.Ex. 32). Chase, however, did not notify the other parties that the notes were lost, apparently hoping that they would be located in time for the scheduled March 5, 1993, closing.

---

**1.** The plaintiffs were subsequently merged into a new corporation. The plaintiffs point out that, under Florida law, they may pursue their claims "as if the merger did not occur," and the defendant does not argue otherwise. *See* § 607.1106(1)(d), Fla.Stat.

The merger, moreover, has no effect upon this court's jurisdiction. The new corporation and the plaintiffs are Florida corporations with their principal place of business in Florida. The defendant is not a Florida corporation and does not have a principal place of business in Florida. Thus, this court has diversity jurisdiction pursuant to 28 U.S.C. 1332, since the jurisdictional amount is clearly present.

After substantial prodding, Chase sent to Tampa the documents it had that related to the proposed assignment. On March 5, 1993, First Union's attorney, David S. Felman, reviewed the documents and discovered that they contained only copies of the notes. He advised Kelly, the plaintiffs' lawyer, that the originals of the notes were missing. Kelly, in turn, called Chase and raised the matter with Langille and Donald E. Hoyt, an attorney who was a Vice–President and Senior Associate Counsel of the defendant. According to Kelly, the Chase officials responded that the notes were not important and that their absence was the plaintiffs' problem.

Kelly, understandably, was not satisfied with that answer. Rather, he discussed with the Chase officials indemnity agreements to be executed by the defendant and Chase Manhattan Bank to protect the plaintiffs and First Union in the event new notes were issued and claims were made on the old ones. He also asked them if the defendant would provide a surety bond in addition to the indemnity agreements. This request was flatly refused.

With respect to the indemnity agreements, Kelly sent a draft of such an agreement to Langille on March 10, 1993 (Plt.Ex. 38). Two days later, Kelly pressed Langille to proceed as quickly as possible with his review of the draft (Plt.Ex. 41). Kelly, however, had not been authorized by Rose to enter into the indemnity agreements, but only to discuss them. On Saturday, March 13, the two senior officials of Chase Manhattan Bank, following Langille's recommendation, approved the execution of the indemnity agreements (Plt.Ex. 39).

In the morning of March 16, Hoyt, under a cover letter indicating that he had not been informed of Chase Manhattan Bank's approval, faxed a revised draft of an indemnity agreement to Kelly (Plt.Ex. 43). Hoyt proposed a modification of Kelly's draft that expanded venue for any lawsuit from just Hillsborough County Circuit Court to include federal courts in the Middle District of Florida and the Southern District of New York,

and the state courts in New York County, New York (*id.*). The revision also included a provision that limited the indemnity agreement to five years (*id.*).

Kelly, in a letter faxed to Langille at 5:06 P.M. that same day, did not comment on the proposed changes to the indemnity agreement (Plt.Ex. 44). Rather, he first summarized an afternoon telephone conversation with Langille which confirmed that the notes were still missing and asserted that a substantial problem was caused for the plaintiffs. Kelly then stated (*id.*):

> A possible solution to this problem would be the refinancing of the loans by Chase at terms acceptable to our client coupled with a mutually acceptable indemnification agreement. You made it quite clear to me that Chase had no interest in pursuing any discussions along these lines. As a result, that leaves my client with no alternative other than to take appropriate action based upon Chase failing to have possession of the original notes and failing to comply with the terms of the letter agreement.

On March 17, Hoyt faxed a letter to Kelly advising that, because he had not received any comments regarding the proposed revisions to the indemnity agreement, he had one prepared for each note in final form, and then executed by the defendant and Chase Manhattan Bank (Plt.Ex. 45). They were to be sent to the defendant's Tampa counsel by overnight courier.

However, on March 18, the plaintiffs filed suit. The action apparently was a declaratory judgment proceeding, seeking directions regarding payment of the lost notes.[2] There purportedly was an alternative request for damages.

The commitment from First Union to acquire the notes expired on March 19. Needless to say, there was no assignment of the notes.

The original notes were finally found in June 1993. They were located in a mislabelled box at General Electric Capital Corpo-

---

**2.** While the suit was mentioned in testimony, a copy of the complaint was not introduced as an exhibit.

ration's[3] ("GECC") facility in Danbury, Connecticut.[4]

After the notes were found, the plaintiffs dismissed their declaratory judgment action. Subsequently, however, they filed this suit for breach of contract.

In an amended complaint, which demanded a jury trial, the plaintiffs alleged that the defendant's failure to produce the notes in connection with the proposed acquisition by First Union constituted a breach of the agreement to assign the notes. The plaintiffs sought damages for the difference in the financing, their expenses, and injury to their business (Doc. 18). The defendant, in its answer, denied the allegations of a breach, and raised several affirmative defenses (Doc. 29).

The parties subsequently consented both to trial before a United States Magistrate Judge, and to a non-jury trial (Doc. 40). As a result, a non-jury trial was held before me during January 25–27, 1995.

## II.

In defense of the plaintiffs' contract claim, the defendant raises several arguments designed to show that the parties did not enter an enforceable contract, and that, even if they did, the agreement was not breached. The defendant's arguments that the agreement is unenforceable lack merit. While the defendant's contention that there was no breach has more substance, it also warrants rejection.

■ A. There is no question, at the outset, that both the plaintiffs and the defendant intended to enter into a binding agreement

and not simply a letter of intent. Thus, Hoyt specifically testified to this effect. And the defendant does not contend otherwise in its memorandum.

The defendant does argue, however, that a binding agreement was not reached. In this respect, Chase asserts, first, that the parties failed to agree to an essential term of the agreement. Specifically, the defendant contends that the parties did not agree upon the schedule of documents necessary to consummate the proposed assignment. This contention relates to the following provision of the agreement (Plt.Ex. 3):

> The assignment will include delivery to the assignee of the executed assignment documents together with all appraisals in your possession, if any, and those documents listed on the attached Schedule I and which are in your possession.

The defendant's argument on this point is based upon the fact that, while the exhibit introduced in evidence as embodying the agreement contained a Schedule I (*id.*), the document actually signed by Langille for Chase had been faxed to him "sans schedule I" (Def.Ex. 92). But Kelly explained that each side had copies of Schedule I, and it was not faxed to Langille on that occasion in order to save transmission charges. Langille, moreover, acknowledged that each party had a copy of Schedule I. Furthermore, there was no testimony that there was any dispute about the wording of Schedule I.[5] These circumstances render meritless the defendant's argument that the agreement was ineffectual because, when Langille signed it, a copy of Schedule I was not attached.

3. The General Electric-related company appears to be named General Electric Capital Corporation (Plt.Ex. 102), although one witness that dealt with the search for the notes referred to the company as General Electric Credit Corporation (Ct.Ex. 2, p. 43).

4. The notes' misplacement began when they were deliberately separated from the remainder of the related documents pursuant to Chase's policy. Subsequently, the defendant sold a number of its assets, including promissory notes, to GECC. The assets were at the defendant's facility in Canton, Massachusetts. At the time of the sale, GECC took over Chase's Canton operation. The notes in this case were not purchased by

GECC, but nonetheless were to remain for a time at that location. Somehow, the notes were placed in a mislabelled box and sent to a GECC facility in Danbury, Connecticut.

5. Hoyt testified that he expected to refine Schedule I after he saw what documents Chase had. However, there was no suggestion that anything was going to be added to Schedule I. Furthermore, it was unnecessary to delete any items from Schedule I in light of the language added at Hoyt's direction that required Chase to transmit only documents in its possession. Clearly, therefore, no meaningful changes to Schedule I were contemplated.

■ The defendant makes a further argument that the parties never reached a binding contract because they never agreed on the form of the assignment instrument. There was nothing in the evidence, however, which suggests that, aside from the problem of the missing notes, the parties would have had any difficulty in preparing an assignment instrument.

Furthermore, contrary to the defendant's contention, the precise wording of the documents to be prepared for the assignment could not be expected to be set forth in the initial agreement. Indeed, at the time of the agreement between the parties, the intended assignee had not been determined. Clearly, the contract between the plaintiffs and the defendant could not reasonably establish terms of the assignment instruments and thereby foreclose input from the potential assignee about any concerns it may have. The defendant, consequently, cannot defeat the agreement on the ground that the assignment instruments were never finalized. The parties' agreement, after all, simply sought to arrange for an assignment, and did not attempt to effectuate the assignment itself.

■ The defendant argues, further, that its contract with the plaintiffs was not enforceable because the agreement was not supported by consideration. The defendant, in this connection, relies on the fact that, under the terms of the notes, early payment of the notes would entitle Chase to a prepayment fee of approximately $400,000. Under the assignment agreement with the plaintiffs, Chase was to receive $60,000 as an assignment fee, reimbursement of all out-of-pocket expenses, and payment of the principal and accrued interest on the notes (Plt.Ex. 3). The defendant asserts that, since the proposed $60,000 fee was less than the prepayment charges it could have received, the $60,000 fee does not constitute valid consideration.

The plaintiffs, however, were not obligated to pay anything beyond the principal and interest. Accordingly, when they agreed to pay the defendant an additional $60,000 in return for an assignment of the notes, they clearly offered legal consideration for the promise of an assignment. While the defendant could have waited and hoped that someday the plaintiffs would incur the prepayment obligation by paying off the notes early, that is not the course it choose to follow. Rather, when the plaintiffs offered to pay Chase $60,000 for a promise to assign notes that the evidence shows Chase did not want, Chase accepted the offer. Under these circumstances, the contract was plainly supported by consideration.[6]

■ The defendant argues, next, that the agreement was not enforceable because mutuality was lacking. Specifically, it contends that it was without any remedy in the event that the plaintiffs elected not to refinance the notes.[7]

This contention, in the first place, is divorced from the facts. The plaintiffs had been, and continued to be, eagerly looking for a financial institution to take the notes.

Moreover, the defendant ignores the principle of Florida law that every contract includes an implied term of good faith and fair dealing. *Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla.1991). Consequently, if the plaintiffs violated that implied term by not attempting to locate an assignee for the notes, the defendant arguably could have sued for the $60,000 assignment fee.

In any event, there plainly was mutuality of obligation here; the plaintiffs promised to pay the defendant certain sums in exchange for the defendant's promise to assign the notes. This presents the typical situation of

---

6. The plaintiffs also point out that the expenses they incurred under the agreement establish consideration based upon the theory that consideration may be comprised of a detriment to the promisee. *Ryland v. Ryland*, 605 So.2d 138, 139 (Fla.App.1992).

7. The defendant's argument that it did not have any remedy under the agreement is construed to be an assertion that mutuality of obligation was lacking. If it was merely contending that mutuality of remedy was missing, the argument would be insufficient since "[t]he absence of mutuality of remedies would not destroy the agreement's validity." *Wright & Seaton, Inc. v. Prescott*, 420 So.2d 623, 625 n. 2 (Fla.App.1982).

a fully enforceable executory contract. *See, e.g., Jenkins v. City Ice & Fuel Co.*, 118 Fla. 795, 160 So. 215, 218 (1935) (an "elementary principle of contracts [is] that mutually enforceable promises may constitute a valid consideration for each other in an executory contract").

█ The doctrine of mutuality of obligation is merely one aspect of the rule that mutual promises constitute consideration for each other. *Wright & Seaton, Inc. v. Prescott, supra*, 420 So.2d at 626. Accordingly, mutuality of obligation is not essential to a binding contract unless the want of mutuality would leave one party without a valid or available consideration for his promise. *Id.* This demonstrates that the authority cited by the defendant on this point, *Pick Kwik Stores, Inc. v. Tenser*, 407 So.2d 216 (Fla. App.1981), is inapposite, since that case involved a contract that was terminable by one of the parties at will. Here, however, consideration flows from each party, and neither side has a contractual right to cancel the agreement. *See Wright & Seaton, Inc. v. Prescott, supra*, 420 So.2d at 626. Consequently, the agreement is not rendered invalid on the ground that mutuality is lacking.[8]

The defendant, in sum, has presented a number of arguments in an attempt to show that the agreement between the parties is not valid. None of those arguments has merit.

█ **B.** The defendant contends further that, even if there was an enforceable contract, it did not breach that agreement. While this argument has weight, the evidence establishes that there was, in fact, a breach.

The defendant initially contends on this point that, because Schedule I was not agreed upon, it did not breach the agreement by failing to produce the original notes. The premise of this argument, however, is wrong. As previously explained (*supra*, p. 1547), Schedule I had been established and was part of the agreement.

More substantial is the defendant's further argument that it did not have to transfer the original notes because they were not in its possession. This argument is based upon the provision, previously quoted in its entirety (p. 1574), which stated that the assignment was to include delivery to the assignee of "those documents listed on the attached Schedule I and which are in your possession" (Plt.Ex. 3). The defendant contends that, because the notes were on Schedule I, and were missing, it had no obligation under the agreement to transfer the original notes.[9]

█ The term "possession" is not defined in the agreement. Since the word has meanings in the law ranging from physical possession to constructive possession, its undefined use renders ambiguous the phrase that limits the defendant's obligation to deliver documents. *See Royal Dev. and Mgt. Corp. v. Guardian 50/50 Fund*, 583 So.2d 403, 405 (Fla.App.1991) ("A phrase in a contract is ambiguous when it is uncertain of meaning and is disputed."). Under these circumstances, consideration of parol evidence, as well as other guides to construction, is appropriate. *E.g., Vienneau v. Metropolitan Life Ins. Co.*, 548 So.2d 856, 859 (Fla.App.1989).

The evidence shows that the initial version of the agreement, which is contained in a

---

8. The plaintiffs also argue that, even if the agreement had not been enforceable initially, it become enforceable once the plaintiffs undertook all they needed to do to close the transaction. *See Ponce Development Co. v. Espino*, 449 So.2d 317, 319 (Fla.App.1984); *Wright & Seaton, Inc. v. Prescott, supra*, 420 So.2d at 627. While this argument has force, it is not necessary, in light of the conclusion that there is mutual consideration, to decide whether the plaintiffs had sufficiently performed their part of the agreement to render enforceable an otherwise unenforceable agreement.

9. The defendant asserts, in connection with this argument, that the agreement did not state that

original documents were to be produced. But it also did not state that copies could be produced in lieu of originals. To the extent there is thus any ambiguity on this matter, the testimony at trial established that the parties intended that the originals of the notes were to be transferred, although copies of ancillary documents would be sufficient. There is certainly no basis in either the agreement or the evidence to suggest that, if the defendant had actual possession of the original notes, it could nonetheless transfer copies of those documents. Consequently, the dispositive factor on this contention is whether the defendant had possession of the original notes.

letter dated February 4, 1993, required Chase to deliver all of the appraisals, and all of the documents on the lengthy list in Schedule I (Plt.Ex. 22). Hoyt called Kelly and told him that he was not certain what documents on Schedule I Chase had. In fact, he knew that one document, apparently a guarantee, was missing.

Kelly, consequently, sent a modified agreement to Chase. This proposal required Chase to deliver "all appraisals in your possession, if any, and those documents listed on the attached Schedule I" (Plt.Ex. 23). Langille signed this agreement for Chase. Hoyt, however, was not satisfied with the amended language and therefore crossed through Langille's signature. Hoyt then called Kelly to say that the new wording did not satisfy his concerns. Kelly then resubmitted a version that added after "Schedule I" the words "and which are in your possession" (Plt.Ex. 3).

Both sides clearly contemplated that the limiting language concerning the transfer of Schedule I documents would apply merely to the ancillary documents, and not to the original notes. In the first place, the limitation arose from Hoyt's concern that he did not know exactly which of the large number of ancillary documents on Schedule I Chase actually had. Further, Kelly, a banking expert for the plaintiff (Alford C. Sinclair), and Langille all testified that, in an assignment, as was involved here, the transfer would include the original notes. Chase consequently made extraordinary efforts to try to find the missing notes, but did not make similar efforts, if it made any at all, to find the missing guarantee. In addition, Kelly stated that there was no intent that the language under consideration would excuse the transfer of the original notes. Langille, in like vein, said that, if he had known the notes were missing, he would have dealt with it explicitly in the agreement.

The conclusion that the parties intended the "possession" language to apply simply to the ancillary documents is not changed by Hoyt's testimony that, in his view, Chase did not have to provide the notes if it did not have them. This testimony seems to be a legal opinion based upon Hoyt's reading of the agreement's language. To the extent that it purports to be a statement of fact about the parties' intent, I reject it as outweighed by the other evidence on this point.

While it is clear to me that the parties contemplated that the original notes would be transferred, that conclusion does not necessarily answer the question whether, under the agreement, Chase was contractually bound to do so. A court, on the basis of the apparent intent of the parties, may not run roughshod over the actual terms of the agreement. *See, e.g., Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So.2d 738, 739 (Fla.App.1989). Nevertheless, the intent of the parties sheds strong light on the proper construction of the ambiguous phrase "and which are in your possession."

There are also other guides that indicate that the concept of "possession" should be given a broad definition. As indicated, the language under consideration was included at the request of the defendant. Therefore, it should be construed against Chase. *Rose v. Lurton Co.*, 111 Fla. 424, 427–28, 149 So. 557, 558 (1933).

Moreover, the facts of this case demonstrate that the term "possession" had to mean something beyond actual, physical possession. Thus, there is no indication from the evidence that any of the documents on Schedule I were in Chase's hands. To the contrary, from all that appears, the documents remained behind after GECC took over the Canton facility from Chase. Consequently, if the language were construed to mean only actual, physical possession, Chase would have had no obligation to produce any documents. That certainly is not what the parties intended by the "possession" provision. Without question, the parties clearly contemplated that any Schedule I documents, including the notes, being kept by GECC at Canton would be transferred as part of the assignment.

The foregoing circumstances plainly demonstrate that the parties intended a broad definition of "possession" along the lines of one that is well established in Florida: "Possession" means " 'having personal charge of or exercising the right of owner-

ship, management or control over' the item in question." *Tingley v. Brown,* 380 So.2d 1289, 1290 (Fla.1980) (quoting *Reynolds v. State,* 92 Fla. 1038, 1041, 111 So. 285, 286 (1926)). A dictionary definition of "possession" similarly is "something owned, occupied, or controlled." *Webster's Third New International Dictionary (Unabridged )* 1770 (1981). Under these definitions, Chase is deemed to have possession of the notes, since it indisputably owned them and had a right to control them.

The defendant argues, however, that neither it nor GECC had possession of the notes because they had been misplaced at GECC's Danbury facility. This argument is not supported by any judicial authority. Moreover, it is based upon the idea of possession being limited to actual control, and ignores the broader definition of possession that includes ownership and right to control. In light of the applicability of the broad definition, Chase could not plausibly have maintained that it lacked possession of the notes if they had been misplaced at one of its own facilities. Since Chase had the same ownership interests in the notes while they were being held by GECC, it follows that the notes were in its "possession" when the custodian misplaced them within one of its facilities. *See United States v. Williams,* 503 F.2d 50 (6th Cir.1974) (defendant flying from Omaha to Cleveland is in "possession" of drug-laden suitcase that airline holds as lost item following change of planes in Chicago).

The defendant, in short, was required by the agreement to transfer any documents on Schedule I that were in its possession. The parties, of course, could have defined the term "possession" in their agreement, but they did not do so. For the reasons previously stated, the term should be given a broad definition to include the right of ownership or control. Under such a definition, the defendant had possession of the notes

even though they had been temporarily misplaced by GECC. And since Chase had possession of the notes, its failure to transfer them was a breach of the agreement.

■ The defendant also asserts that there was no breach because the plaintiffs acted unreasonably when they declined to accept the indemnity agreements from it and Chase Manhattan Bank. While the plaintiffs' refusal to accept the indemnity agreements bears strongly on the defense of failure to mitigate, it has no relevance to the question whether there was a breach. The parties' contract required the defendant to transfer the notes, and that agreement was breached when the defendant failed to do so. While there would have been no breach if the contract required the plaintiffs to accept indemnity agreements in the event the original notes were lost, the contract contained no such provision. Consequently, a breach occurred when the defendant did not transfer the notes, and the subsequent events regarding the indemnity agreements did not cancel that breach.

The plaintiffs, therefore, have proven that they had an enforceable agreement with the defendant. Moreover, they have shown that the defendant breached that agreement.

### III.

■ The defendant argues further that, even if it breached the agreement, the plaintiffs should not recover damages because they failed to avoid the consequences of that breach.[10] Specifically, it contends that the assignment of the notes to First Union could have been accomplished by the plaintiffs executing replacement notes and accepting indemnity agreements from the defendant and Chase Manhattan Bank.[11] The plaintiffs respond that they were not comfortable with this procedure in the absence of

---

10. The defendant presents its argument on this point under the doctrine of avoidable consequences. That doctrine, however, is no different than the principle that an injured party has a duty to mitigate damages. *See, e.g., Graphic Assocs., Inc. v. Riviana Restaurant Corp.,* 461 So.2d 1011, 1014 (Fla.App.1984); *Banks v. Salina,* 413 So.2d 851, 853 (Fla.App.1982). Consequently, the terms are used interchangeably. *Id.*

11. The defendant also raised a contention that the plaintiffs failed to mitigate their damages after the notes had been found because they did not make new arrangements for assignment of the notes. The defendant, however, expressly abandoned this contention during the trial.

a surety bond, which the defendant refused to obtain. The plaintiffs also found unacceptable certain provisions in the indemnity agreement proposed by the defendant.

■■■■■■ The doctrine of avoidance of consequences is well-established in Florida. *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 921 (11th Cir.1987). That doctrine was stated in *Winter v. American Auto. Ass'n*, 149 So.2d 386, 387 (Fla.App.1963) (brackets in original), as follows:

> In an action on a contract, if a plaintiff [by reasonable exertion of care] can prevent damages resulting to him by reason of the defendant's wrongful acts, it is his duty to do so and, so far as he can thus prevent them, he cannot recover therefor.

Another Florida court, quoting § 350 of the Second Restatement of Contracts, explained that a party is prevented "from recovering those damages inflicted by a wrongdoer which the injured party 'could have avoided without undue risk, burden, or humiliation.'" *Graphic Associates, Inc. v. Riviana Restaurant Corp.*, 461 So.2d 1011, 1014 (Fla.App. 1984). A party wronged by a breach of contract, in other words, has an affirmative obligation to take reasonable steps to avoid, or minimize, loss, but is not required to enter ameliorating transactions that are risky. *See Restatement (Second), Contracts* § 350, cmt. g (1979).

As previously shown, after Kelly discovered on March 5, 1993, that the original notes were missing, he communicated with Hoyt and Langille about possible solutions to the problem. In Kelly's communications, he inquired whether, in order to protect against adverse consequences from the plaintiffs' execution of replacement notes, the defendant would be willing to post a surety bond, and whether the defendant and Chase Manhattan Bank would be willing to execute agreements indemnifying the plaintiffs against harm caused by the subsequent presentation of the lost notes. The defendant flatly rejected the posting of a surety bond. On the other hand, it and the bank agreed to provide indemnity agreements.

■■■■■■ The plaintiffs contend, first, on this point that they were not required to consent to indemnity agreements unsecured by a surety bond because that approach would involve a rewriting of the contract. This contention is supported solely by a cryptic sentence in *Hilsenroth v. Kessler*, 446 So.2d 147, 150 (Fla.App.1983). Consequently, this citation is unpersuasive. Moreover, the doctrine of avoidance of consequences in these circumstances contemplates that some contractual right will be denied a party, but nevertheless requires that party to take alternative steps to mitigate a loss. Thus, it is vacuous for the plaintiffs to say that they "should not have been obligated to relinquish their right to have the original promissory notes transferred and assigned to First Union" (Doc. 72, p. 2). The notes were lost and could not be transferred. The doctrine of avoidance of consequences required the plaintiffs in that situation to take reasonable non-risky steps to mitigate the damage resulting from that occurrence. The question here is whether the execution of replacement notes, protected by indemnity agreements, but not a surety bond, is such a course.[12]

Rose, the plaintiffs' President, and Alford Sinclair, the plaintiffs' banking expert, each testified that, even with indemnity agreements, the circumstances created an unreasonable risk of double liability in the absence of a surety bond. In order to justify their opinions, the two witnesses had to explain why indemnity agreements from Chase Manhattan Bank would have been inadequate. Both stated that they had concerns about that institution's financial condition. This concern centered on the fact that in 1990 the

---

12. The law, it is noted, did not impose upon the plaintiffs the affirmative obligation to obtain its own surety bond and then sue the defendant for that expense. In the first place, where both sides have equal opportunity to take action to mitigate damage, the plaintiff is not required to do something that the breaching party has refused to do. *Purcell v. Williams*, 511 So.2d 1080 (Fla.App. 1987); *see* 22 *Am.Jur.2d* Damages § 508 (1988).

Further, a plaintiff need not make substantial expenditures to avoid damages from a breach. *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 29 (5th Cir.1992). Since here the premium for a surety bond was at least $24,000, and could have been as high as $120,000, the plaintiffs were not required to purchase a bond for their own protection.

bank had suffered a substantial loss and its stock had dropped to a low value. Sinclair acknowledged, however, that the bank was restored to profitability in 1991 and 1992. Further, by about the time of the events in this case, its stock had risen substantially. Sinclair pointed out that, nevertheless, in 1993, the bank received a relatively poor rating from a national rating service.

Rose, in explaining his perceived need for a surety bond, spoke of an unsatisfactory comfort level. The law, however, is not concerned with Rose's comfort level, but only with whether he is being required to take an undue risk. Proceeding without a surety bond would not involve an undue risk unless there was a reasonable likelihood in March 1993 that Chase Manhattan Bank, as well as the defendant, would fail, and thereby be unable to honor its indemnity agreements. In my view, the testimony from Rose and Sinclair concerning the bank's financial condition falls far short of demonstrating that there was a reasonable likelihood in March 1993 that it would fail.

Significantly, Felman, the attorney for First Union, testified that First Union would not have required a surety bond in addition to indemnity agreements. The plaintiffs seek to minimize this testimony by asserting that First Union was better secured than they were, and thus the parties were not in the same position. But Felman stated that he did not view First Union's position as being much different than the plaintiffs, since First Union's loan was based on the plaintiffs' financial condition (Ct's Ex. 1, p. 36). Even more important, Felman told his client that "Chase Manhattan is a substantial institution with the financial ability to back its indemnity, so we feel comfortable with this indemnity arrangement" (Ct's Ex. 1, ex. 9).

Felman's opinion regarding the necessity of a surety bond is entitled to greater weight than the competing opinions of Rose and Sinclair. Significantly, Felman's view reflects the neutral and detached opinion of an attorney required to take action in a substantial transaction. The views of Rose and Sinclair, by contrast, are interest-tinged, *post-hoc* rationalizations.

Rose, without question, is very sophisticated in the area of banking and finance, having completed course work toward a Ph.D. degree in business and applied economics, and having worked for five years for Chemical Bank. It seems that, as a result, Rose took the lead in deciding how to proceed in this case. For example, he authorized Kelly to discuss an indemnity agreement with Chase, but did not authorize him to execute one.

Rose's active role is significant because the circumstances indicate that the plaintiffs' approach to remedying the misplacement of the notes was governed by a desire to gain an advantage, instead of the legal requirement of mitigation of damages. Thus, on March 16—more than three days before the existing deadline for closing—the plaintiffs, without any attempt to negotiate an indemnity agreement, requested that the defendant agree to "the refinancing of the loans by Chase at terms acceptable to our client coupled with a mutually acceptable indemnification agreement" (Plt.Ex. 44). Importantly, this proposal, if accepted, could have placed Rose and his wife in a more favorable position than if the First Union assignment had been completed. Under the First Union agreement, personal guarantees were required from Rose, his wife, and a company of Rose's named P K Ventures, Inc. The proposal sent to the defendant would have eliminated the guaranties, and probably would have cost less to accomplish. In other words, Rose, at this point, was not interested in simply obtaining a shield against double liability; rather he thought he had found a sword that he could wave in order to improve his position. Consequently, I discount Rose's opinion that, in addition to indemnity agreements, a surety bond was required to eliminate undue risk.

For several reasons, I also discount Sinclair's opinion that it was commercially reasonable for Rose to decline to proceed with the transaction because Chase refused to provide a surety bond. In the first place, this opinion proves little; it was, of course, reasonable for Rose to want a surety bond, just as it was reasonable for the defendant, because of cost, to decline to provide one. Sinclair's opinion is thus not the equivalent of saying that it would have been *unreasonable*

for the plaintiffs to have to proceed without a surety bond.

Assuming that Sinclair had opined that a surety bond was necessary, I would not have accepted Sinclair's opinion on that point. Sinclair was a compensated expert, and thus not a truly objective witness. Moreover, as an expert, he mostly testified against banks, thereby indicating a predisposition in these matters. In addition, his listed reasons for not proceeding without a surety bond seemed to echo Rose's statement of concerns. Particularly since, as explained below (pp. 1583–84), some of those concerns provide a completely unpersuasive basis for declining to proceed without a bond, there is even more reason to doubt that Sinclair engaged in independent thinking and analysis. Finally, Sinclair acknowledged that he had never encountered in his banking career a situation involving a lost instrument, and thus he was not testifying based upon his professional experience.

For these reasons, I accept, over the opinions of Rose and Sinclair, the contemporaneous, objective opinion of Felman that indemnity agreements from Chase Manhattan Bank would have been sufficient, and that a surety bond was not necessary.[13]

Felman, moreover, noted another factor that made the possibility of double liability extremely unlikely. Thus, he pointed out that the "risk seems remote—Chase has been collecting payments under the note without incident for three and one half years" (Ct's Ex. 1, ex. 9).

Langille expressed similar views when recommending to the officials of Chase Manhattan Bank that the bank execute an indemnity agreement. Thus, his memorandum to them stated (Plt.Ex. 39):

*Nature of Risks to Borrowers and Lender*

In speaking with counsel for the Borrowers, there are two risks identified that need to be covered by a Letter of Indemnity:

I.  Chase has sold or encumbered the Original Notes, thereby giving a third party a *legitimate claim* on the Borrowers and impairing the position of the Lender. Although this indemnity is somewhat redundant given our previous agreement to represent and warrant Chase's ownership of the Original Notes and the fact that Chase has taken no actions that would cause the Original Notes to be encumbered, I have no problem in restating this in a Letter of Indemnity.

II. In the event that the Original Notes were stolen and fraudulently assigned as collateral for a loan, both the Borrowers and the Lender desire to be held harmless from *the fraudulent claim* of any third party. While counsel for the Borrowers acknowledged that a claim of this nature could be defeated, neither the Borrowers nor the Lender wish to be exposed for the cost of defense.

*Recommendations*

I am confident that the risk to Chase of a sustainable claim under an indemnity is so negligible that the proper business decision is to issue a Letter of Indemnity that addresses the expressed, real concerns of the Borrowers and Lender and limits access to Chase merely to these events and no others.

The views of Felman and Langille, as expressed in their recommendations for action, cogently indicate that the likelihood of someone making a viable claim based upon the lost notes was minimal.[14] The plaintiffs re-

---

**13.** The plaintiffs argue in their post-trial memorandum that the defendant failed to carry its burden of proof on the issue of mitigation, apparently because it did not present the testimony of an expert witness. In my view, Felman's thoughts in support of his actions are far more compelling than the opinion of a paid witness.

**14.** The defendant argues that, under the law in effect at the time the notes were made, they were non-negotiable because the amount due on them

could not be determined without reference to an outside source. *See* § 673.104, Fla.Stat. (1987). The plaintiffs answer that a 1991 remedial amendment to the statute demonstrates that the notes were negotiable instruments. *See* § 673.106, Fla.Stat. (1987). While it seems to me that the plaintiffs have the better of the argument, the issue regarding the negotiability of the notes need not be resolved. It is enough to say that the plaintiffs, in deciding how to proceed

spond that the size of the notes exacerbated the risk that was involved. While that is undoubtedly true, the fact remains that, with an indemnity agreement from Chase Manhattan Bank, the plaintiffs' exposure to double liability was extremely remote. Thus, the plaintiff would not suffer liability on the lost notes unless there occurred the combination of two very unlikely events: the presentation of the notes by a party with a valid claim, and the failure of Chase Manhattan Bank. Of course, a surety bond was needed only to protect against the consequences of both of these circumstances happening. Since there was, at most, a minimal chance that even one of these events would take place, I find that the plaintiffs' demand for a surety bond was not reasonable.[15]

■ The plaintiffs argue further that, in all events, the indemnity agreements offered by the defendant and Chase Manhattan Bank were unacceptable. Specifically, they complain about the venue and the limitation provisions included in those agreements.

As originally drafted by Kelly, venue for any suit on the indemnity agreements would have to be filed in Hillsborough County Circuit Court (Plt.Ex. 38). Hoyt proposed to modify that provision to permit suit also in this court, the federal court in the Southern District of New York, and the state courts in New York County, New York (Plt.Ex. 43). Rose testified at trial that this modification was unacceptable because he did not want to be exposed to the additional expense that would result from proceeding in New York.

Importantly, however, Rose's objection was never stated to Hoyt (or anyone else at Chase) during the time the indemnity agree-

ments were being prepared. Hoyt testified at trial that he considered the venue provision to be innocuous and said he probably would have "rolled over" on that matter. Moreover, Felman, for First Union, stated that he would not have a concern about the changes to the venue provision.

Clearly, a mutually satisfactory venue provision would not have been a stumbling block to parties in these circumstances who were reasonably negotiating an indemnity agreement in good faith. The reason agreement was not reached on that matter was the plaintiffs' total failure to discuss it. As indicated, the plaintiffs responded to Hoyt's proposed modifications to the indemnity agreements with a demand that the defendant refinance the plaintiffs' notes at a rate that was acceptable to them. While the plaintiffs also sought, along with the refinancing, a mutually acceptable indemnity agreement, the response did not address the specifics of such an agreement. Moreover, the plaintiffs filed suit two days later without ever having discussed any objections they had to Hoyt's modifications.

Under these circumstances, the plaintiffs cannot hide behind a purported dissatisfaction with the proposed venue provision. The doctrine of avoidance of consequences imposed upon the plaintiffs an affirmative duty to make reasonable substitute arrangements. Insofar as the venue provision is concerned, the plaintiffs did not discharge that duty as a result of their total failure to discuss that provision with the defendant. Consequently, the plaintiffs' (belated) unhappiness with the provision cannot be a basis for concluding that they were reasonable in refusing to accept the indemnity agreements.[16]

---

upon discovering the loss, could reasonably have thought that the notes were negotiable.

**15.** The plaintiffs point to a Minnesota case in which a surety bond was required in a lost instrument situation. *See First Construction Co. v. Tri-South Mortgage Investors,* 308 N.W.2d 298 (Minn.1981). That decision, however, simply illustrates that the extent of protection thought necessary by courts faced with a case involving a lost instrument varies with the circumstances. *Id.* at 300–301. For the reasons stated, it is my view that indemnity agreements from not only the defendant, but also from Chase Manhattan

Bank, would have provided the plaintiffs adequate protection in this case.

**16.** In their post-trial memorandum, the plaintiffs complain that the venue provision was made more onerous by a proposed revision that would require the plaintiffs to give 15 days notice prior to filing suit. This provision was not identified by either Rose or Sinclair as a separate basis for concern and thus seems to be a post *post-hoc* rationalization. Accordingly, the contention should be discounted. In any event, because the notice provision would seem as susceptible to negotiation as the venue provision, and the plaintiffs' conduct precluded that course, the plaintiffs

Similarly, the plaintiffs cannot cogently claim that the indemnity agreements were unacceptable due to their limitation provisions. Kelly's draft of an indemnity agreement did not contain any termination date. Hoyt, undoubtedly troubled by indemnity agreements of infinite duration on the books of the defendant and Chase Manhattan Bank, included a provision that the agreements were effective for five years unless terminated earlier by delivery of the original notes to First Union (Plt.Ex. 43). As the plaintiffs explain in their post-trial memorandum (Doc. 72, p. 11), because the notes are subject to a five-year statute of limitations, the plaintiffs would be exposed to double liability until December 15, 2000, on one of the notes, and until December 15, 2001, on the other. Thus, the indemnity agreements would need to extend until those dates.

Again, there is no reason to think that the defendant and the bank would not have agreed to termination dates of December 15, 2000, and December 15, 2001, if that issue had been raised with them. Thus, Hoyt testified that the 5–year limitation was subject to discussion. Furthermore, the defendant and the bank would not have been significantly burdened by extending the latest termination date by about another 3 years, 9 months. Under these circumstances, the defendant and the bank, in all likelihood, would have assented to the later termination dates. Moreover, to the extent there is any uncertainty on this point, that uncertainty should be resolved against the plaintiffs, since it was their precipitous conduct that prevented reasonable negotiations concerning the indemnity agreements. Consequently, while the termination dates of the indemnity agreements were a legitimate matter of concern, the plaintiffs' failure to engage in any discussion of that issue constitutes a violation of their affirmative duty under the doctrine of avoidance of consequences to make substitute arrangements.

Rose also asserted (and Sinclair seconded) other reasons why Rose had an extremely high level of discomfort in proceeding with the transaction under the indemnity agreements. These reasons boiled down to a feeling by Rose that he should not trust the defendant's officials with whom he had dealt. Thus, he found those officials difficult to deal with; they had lost the notes; they had not been candid in advising the plaintiffs about the misplacement; and they had sought to obtain payment on the notes prior to transmittal of the documents.[17]

These purported justifications for the plaintiffs' refusal to proceed with the assignment under indemnity agreements are, in my view, unpersuasive, make-weight arguments. The plaintiffs, after all, would not be required to rely upon oral representations of the defendant's officials, but would have the protection of written indemnity agreements from the defendant and Chase Manhattan Bank. Moreover, the plaintiffs' final proposal to the defendant prior to filing suit on March 18, 1993, requested that the defendant provide the plaintiffs with refinancing and indemnity agreements. This proposal, under which the plaintiffs would continue to deal with the defendant, belies the contention that the plaintiffs did not trust the defendant enough to do business with it.

For these reasons, the plaintiffs' failure to proceed with the assignment, while covered by indemnity agreements from the defendant and Chase Manhattan Bank, was not reasonable. Accordingly, they cannot recover damages for any losses they could have avoided if they had gone forward with the transaction. *Messer v. E.F. Hutton & Co., supra,* 833 F.2d at 921. In this case, that includes all of the damages the plaintiffs claimed at trial. Thus, the plaintiffs' damage calculations were based upon a benefit-of-the-bargain theory, and sought to recover the interest that would have been saved under an assignment to First Union, less expenses that would have been incurred. Those claimed damages, which total approximately $350,000, could all have been avoided if the plaintiffs had simply proceeded with the assignment to First Union under the protection of the indemnity

cannot reasonably rely upon the notice provision as a ground for refusing to proceed with an assignment covered by indemnity agreements.

17. Hoyt denied that payment was sought before the documents were provided. It is not necessary to resolve this factual dispute.

agreements. Consequently, the plaintiffs are precluded from recovering those damages.

■ The question was raised, *sua sponte,* whether, if the plaintiffs were foreclosed from recovering their benefit of the bargain as a result of their failure to mitigate damages, they may nevertheless recover expenses incurred in connection with arranging the transaction with First Union. The plaintiffs in their Supplemental Trial Memorandum (Doc. 72, p. 16) responded in a three-sentence paragraph with a short footnote that, should that prove to be the case, they would then be entitled to recover expenses in the amount of $33,757, plus interest from May 27, 1993.

■ In cases involving a total breach of contract, the injured party is entitled to an election of remedies. *E.g., Rector v. Larson's Marine, Inc.,* 479 So.2d 783, 785 (Fla.App.1985). Under the election of remedies doctrine, the injured party "may treat the contract as void and seek the damages [known as "reliance damages"] that will restore him to the position he was in immediately prior to entering the contract," or, alternatively, "he may elect to affirm the contract, insist upon the benefit of his bargain, and seek the damages [called "expectation damages"] that would place him in the position he would have been in had the contract been completely performed." *Id.* Significantly, these two distinct remedies are mutually exclusive and, as such, may not both be recovered by the injured party. *Pathway Fin. v. Miami Int'l Realty Co.,* 588 So.2d 1000, 1005 (Fla.App.1991).

■ The plaintiffs' luke-warm response to the court's *sua sponte* inquiry appears sufficient to constitute an election to seek reliance damages in the event that they are precluded from recovering expectation damages. Such an election is legally permissible, since "an election between legally inconsistent remedies can be made at any time prior to the entry of judgment." *Barbe v. Villeneuve,* 505 So.2d 1331, 1333 (Fla.1987). The defendant, accordingly, does not argue in its post-trial memorandum that the plaintiffs have waived their right to recover reliance

damages because they focused on expectation damages throughout the trial.

■ The defendant does contend, however, that the same failure to avoid consequences that bars expectation damages also bars recovery of reliance damages. But the defendant cites no authority, and offers no legal analysis, in support of this argument.

There is some surface appeal to the idea that, if the plaintiffs had gone forward with the assignment, they would have eventually recovered any expenses they incurred in arranging the assignment. As indicated, however, Florida law affords injured parties the option of treating the contract as void and recovering reliance damages. That option would be nullified if, as the defendant suggests, the plaintiffs had to proceed with the transaction in order to recoup their expenses. Thus, it is unreasonable to conclude under the circumstances of this case that the plaintiffs are foreclosed from recovering any expenses incurred in preparing to carry out the agreement simply because they decided not to go forward with substitute arrangements.

Of course, as the defendant points out, in order to recover expenses, a party must prove those expenses with a reasonable degree of certainty and demonstrate that the amounts expended were reasonable. *Cf. Young v. Johnston,* 475 So.2d 1309, 1313 (Fla.App.1985). In this case, the plaintiffs sought to recover damages on a benefit-of-the-bargain theory, and therefore did not directly attempt to prove their expenses as damages. Nevertheless, because the plaintiffs recognized that certain expenses would be deducted when computing their expectation damages, evidence of expenses was adduced during the course of the trial. In their supplemental memorandum, the plaintiffs seek recovery of $33,757 of those expenses.

The plaintiffs do not identify in their supplemental memorandum the specific items that comprise their claim for $33,757, but simply refer to plaintiffs' exhibit 83 (Doc. 72, p. 16). That exhibit identifies certain legal fees the plaintiffs paid to the law firms representing First Union and themselves.

The plaintiffs are clearly entitled to recover legal fees paid to First Union's lawyers.

Under the agreement with First Union, the plaintiffs were obligated to reimburse First Union for those expenses (Plt.Ex. 5, p. 4). Moreover, there was testimony that the plaintiffs negotiated a significant reduction in the fees that were billed by First Union's attorneys. Particularly in the absence of any evidence to the contrary, this establishes that the legal expenses of $15,103.97 that the plaintiffs actually paid on behalf of First Union were reasonable. The plaintiffs, in addition, are entitled to recover $3,322.88 in prejudgment interest at 12 percent on this amount from May 27, 1993 (the date specifically asserted by the plaintiffs (Doc. 72, p. 16)). *See* § 687.01, Fla.Stat.[18]

The plaintiffs also seek recovery of some of the attorneys' fees they paid to their lawyers in this case. They failed to present satisfactory evidence on that claim, however. The failure resulted primarily from the previously stated fact that the plaintiffs sought expectation damages throughout the trial and presented evidence of expenses only as deductions from their desired recovery. As a result, the evidence regarding the expenses was brief and general.

In particular, the plaintiffs made no effort to show what legal services had been rendered for the compensation that was sought to be recovered. This is significant because the bills for which they seek reimbursement were paid in April and May, 1993—dates after the pertinent events in this case. Moreover, those legal services which were rendered during March 1993 in the attempt to secure refinancing from the defendant should not be recovered, since that approach was unreasonable and ill-conceived.[19] The plaintiffs, in short, failed to demonstrate that the legal work for which they seek recovery was performed in connection with those aspects of this matter that would justify reimbursement. In this respect, it is also noted that the checks upon which the plaintiffs base their claim are not from the plaintiffs, but from P K Ventures, Inc. (Plt.Ex. 83).

Furthermore, the plaintiffs made no effort to demonstrate that the legal expenses were reasonable. Contrary to the defendant's suggestion, the plaintiffs were not required to make the same showing under *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), that would be required if this court were to set the fees. Nevertheless, Florida law requires that a party establish the reasonableness of any incurred expenses that it seeks to recover. *See Jackson v. Riley*, 427 So.2d 255, 256 (Fla.App.1983). That was not done here.

The plaintiffs, therefore, are not entitled to recover any of their own legal fees.

## IV.

The plaintiffs, in sum, have established that the defendant breached the agreement to assign the promissory notes. However, the plaintiffs' unreasonable failure to make substitute arrangements for the assignment precludes their recovery of expectation damages. While they can, nevertheless, recover reliance damages, the only such damages that have been sufficiently proven are the payments to First Union's lawyers. The plaintiffs' damages are therefore limited to $15,103.97, plus prejudgment interest of $3,322.88, for a total of $18,426.85. Under these circumstances, each side should bear its own costs.

---

18. Prior to October 1, 1994, § 687.01, Fla.Stat., provided that, in the absence of a specified contractual rate, prejudgment interest should accrue at a rate of 12 percent per annum. This statute was amended effective October 1, 1994, however, and now provides that prejudgment interest should accrue at a rate calculated pursuant to § 55.03, Fla.Stat. The defendant has not argued that the amendment affects the rate of prejudgment interest that began to accrue before the date of the amendment. Moreover, the defendant has not provided any information that would establish a rate other than 12 percent. Accordingly, interest will be calculated at a rate of 12 percent per annum for the twenty-two month period from May 27, 1993, to March 27, 1995.

19. This is not necessarily to say that the lawyers' advice was faulty. As indicated, Rose was a strong force in these events, and, from all that appears, he may have declined to follow legal advice that would have permitted the transaction to be completed. And certainly the plaintiffs should not be reimbursed for legal advice they declined to follow.